1　Roger M. Schrimp, State Bar No. 039379
　　George P. Rodarakis, State Bar No. 222214
2　Eric J. Sousa, State Bar No. 232541
　　DAMRELL, NELSON, SCHRIMP,
3　　PALLIOS, PACHER & SILVA
　　1601 I Street, Fifth Floor
4　Modesto, CA 95354
　　Telephone:  (209) 526-3500
5　Facsimile:  (209) 526-3534

6　Attorneys for Plaintiffs
　　Ted Gaylord and Sheri Gaylord, as
7　individuals and dba J&T Cattle Company

8

9　　　　　　　　**UNITED STATES DISTRICT COURT**

10　　　　　　　**EASTERN DISTRICT OF CALIFORNIA**

11　　　　　　　　　　**FRESNO DIVISION**

12

13　TED GAYLORD and SHERI GAYLORD, as　　　No. 1:10-CV-00620-AWI-MJS
　　individuals and dba J&T CATTLE COMPANY,
14
　　　　　　　　　　　　　　　　　　　　**MEMORANDUM OF POINTS AND**
15　　　　　　　Plaintiffs,　　　　　　　**AUTHORITIES IN SUPPORT OF**
　　　　　vs.　　　　　　　　　　　　　**PLAINTIFFS' OPPOSITION TO**
16　　　　　　　　　　　　　　　　　　　**DEFENDANTS' MOTION FOR SUMMARY**
　　NATIONWIDE MUTUAL INSURANCE　　　　**JUDGMENT OR, IN THE ALTERNATIVE,**
17　COMPANY, et al.,　　　　　　　　　　**FOR PARTIAL SUMMARY JUDGMENT**

17　　　　　　　Defendants.
18　　　　　　　　　　　　　　　　　　　**Date:**　　**January 24, 2011**
　　　　　　　　　　　　　　　　　　　**Time:**　　**1:30 p.m.**
19　　　　　　　　　　　　　　　　　　　**Crtrm:**　　**2**

20

21

22

23

24

25

26

27

28

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

# **TABLE OF CONTENTS**

**Page(s)**

Table of Authorities ........................................................................................ iii

I.   Introduction ........................................................................................... 1

II.  Factual Background And Statement Of Undisputed And
     Disputed Material Facts ....................................................................... 2

III. Legal Argument .................................................................................... 7

    A.   Standard On Motion For Summary Judgment ........................... 7

    B.   Plaintiffs Are Entitled To Pursue Their First Party Claim Because
        The Limitations Period Was Equitably Tolled During The Parties'
        Investigation Of The Claim .......................................................... 8

        1.   The Principle of Equitable Tolling Applies To
            Plaintiffs' First Party and Bad Faith Claims ...................... 9

    C.   The Policies Should Be Interpreted In Favor Of Coverage
        In Light Of Plaintiffs' Reasonable Expectations And
        According To The Representations Made By Stewart ................ 14

        1.   Contract Interpretation Rules Under California
            Law Support Plaintiffs' Interpretation of the
            Policies ............................................................................. 15

        2.   Plaintiffs are Entitled to Rely on the Broad
            "Livestock Operations" Endorsement in the Farm
            Policy as Controlling Coverage Here, Because
            Endorsements Govern Over Exclusionary Provisions
            in the Policies .................................................................. 17

        3.   The Fact That "Livestock Operations" Is Not Defined
            Further Evidences the Existence of an Ambiguity
            in This Case and Therefore a Triable Issue of Fact ......... 18

        4.   Defendants Are Bound by Stewart's Coverage
            Representations Since Stewart Can be Deemed
            Defendants' Soliciting Agent When They Were Made ....... 20

        5.   Plaintiffs Are Excused From Reading the Policies
            Under California Law, Because They Relied Upon
            The Representations of Stewart as Their Trusted
            Insurance Agent and Broker .............................................. 23

    D.   Defendants Violated Their Duty To Defend Plaintiffs
        In The Kamangar Claim .............................................................. 24

    E.   Plaintiffs' Bad Faith And Punitive Damages Claims
        Cannot Be Summarily Denied When Triable Issues
        Of Fact Exist Regarding Coverage And The Reasonableness
        Of Defendants' Denials ............................................................... 25

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

i

IV.    Conclusion ............................................................................................................ 27

ii

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

# Table of Authorities

**Cases**

**Page(s)**

Ashou v. Liberty Mut. Fire Inc. Co.
138 Cal. App. 4th 748, 762 ................................................... 10, 14

American Alternative Ins. Corp. v. Superior Court
135 Cal.App. 4th 1239, 1247 (2006) ..................................... 18, 19

Bay Cities Paving & Grading, Inc. v. Lawyers Mutual Insur. Co.
5 Cal. 4th 854 (1993) ............................................................. 19, 20

Butcher v. Truck Ins. Exchange
77 Cal. App. 4th 1442, 1462 (2000) ...................................... 23

Clement v. Smith
16 Cal. App. 4th 39, 46 (1993) .............................................. 23

Continental Casualty Co. v. Phoenix Construction Company
46 Cal. 3d 423, 431 (1956) .................................................... 17, 23

Dairy America, Inc. v. New York Marine and General Ins. Co.
2010 WL 2102716, 6 .............................................................. 8, 14, 16, 18, 25

Dias v. Nationwide Life Ins. Co.
700 F. Supp. 2d 1204, 1213 (E.D. Cal. 2008) ....................... 7, 8, 20, 21

Eaton Hydraulics Inc. v. Continental Cas. Co.
132 Cal. App. 4th 996, 973 (2005) ........................................ 12

Flintkote Co. v. General Acc. Assur. Co. of Canada
480 F. Supp. 2d 1167, 1171 (N.D. Cal. 2007) ....................... 8, 11, 12

Forman v. Chicago Title Ins. Co.
32 Cal. App. 4th 998 (1995) .................................................. 11

Foster-Gardner, Inc. v. National Union Fire Ins. Co.
18 Cal. 4th 857, 869 (1998) ................................................... 24

Frontier Oil Corp. v. RLI Ins. Co.
153 Cal. App. 4th 1436 (2007) .............................................. 17, 24

Gray v. Zurich Ins. Co.
65 Cal. 2d 263, 270, 275 (1966) ............................................ 24

Hadland v. NN Investors Life Ins. Co.
24 Cal. App. 4th 1578-1586 (1994) ....................................... 21, 22

Harbison v. Am. Motorists Ins. Co.
636 F. Supp. 2d 1030, 1040-41 (E.D. Cal. 2009) .................. 25, 26

Haynes v. Farmers Ins. Exchange
32 Cal. 4th 1198, 1208 (2004) ............................................... 15, 16, 17, 20, 23

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Horace Mann Ins. Co. v. Barbara B.
4 Cal. 4th 1076, 1081 (1993)..................................................... 24

KF Dairies, Inc. & Affiliates v. Fireman's Fund Ins.
224 F. 3d 922, 925 (9th Cir. 2000)............................................ 15, 16

Lambert v. Commonwealth Land Title Ins. Co.
53 Cal. 3d 1072, 1077 (1991)..................................................... 12

McGrananhan v. Insurance Corp. of NY
544 F. Supp. 2d 1052, 1056 (E.D. Cal. 2008) ........................... 7, 8, 24

Montrose Chemical Corp. v. Admiral Ins. Co. (Montrose II)
10 Cal. 4th 645, 674 (1995)........................................................ 9, 11, 12, 24, 26

Prudential-LMI Com. Insurance v. Superior Court
51 Cal. 3d 674, 687 (1990)....................................................... 9, 10, 11, 13

San Jose Crane & Rigging, Inc. v. Lexington Ins. Co.
227 Cal. App. 3d 1314, 1316 (1991).......................................... 10, 11, 14

Singh v. Allstate Ins.Co.
63 Cal. App. 4th 135, 142 (1998)............................................... 9

Spray, Gould & Bowers v. Associated International Ins.Co.
71 Cal. App. 4th 1260, 1272 (1999)........................................... 21

Sully Jones Contractors, Inc. v. American Safety
2010 WL 1839114, 5 (S.D. Cal. 2010) ...................................... 25, 26

Statutes

California Civil Code §§ 1639.................................................... 18

California Civil Code § 1641...................................................... 18

California Civil Code §§ 1647.................................................... 18

California Code of Civil Procedure § 337 .................................. 16

California Code of Civil Procedure § 339(1)............................... 11

California Insurance Code § 2071 .............................................. 9

Fed. R. Civ. P. 56(c) ................................................................ 7

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1   Plaintiffs Ted Gaylord and Sheri Gaylord individually and doing business as J&T Cattle

2   Company (hereinafter collectively "Plaintiffs") submit the following memorandum of points and

3   authorities in support of their opposition to the Motion for Summary Judgment or, in the Alternative,

4   for Partial Summary Judgment, filed herein by Defendants Nationwide Mutual Insurance

5   ("Nationwide") and AMCO Insurance Company ("AMCO") (collectively hereinafter "Defendants").

## I.

## **INTRODUCTION**

8   Defendants claim Plaintiffs are not entitled to first party coverage for approximately 2,000 head

9   of cattle in their Livestock Operation that died and/or were sent to early slaughter as a result of having

10   consumed contaminated feed. Defendants first contend that the livestock is not covered because it was

11   not specifically scheduled on the subject policies. <u>See</u> Joint Statement Of Undisputed Facts In Support

12   Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, filed by

13   Defendants herein ("JSUF"), 4-6. Defendants then contend contaminated feed is not a "covered cause[]

14   of loss" enumerated in the policies. JSUF, 8-10. Defendants further point to provisions in the subject

15   policies that exclude coverage for damage resulting from Plaintiffs' "custom care and feeding of

16   livestock," from Plaintiffs' "business pursuits," and from conduct that Plaintiffs had contracted to

17   perform. JSUF, 13-14, 17-19. Defendants rely on these same arguments to wrongfully deny coverage

18   under their duty to defend and indemnify Plaintiffs for their losses.

19   These exclusions, however, are in complete contrast to the reasonable expectations of Plaintiffs,

20   who purchased the comprehensive farm policy package at issue specifically to protect their personal

21   and business needs *and specifically to cover losses from contaminated feed.* <u>See</u> Plaintiffs' Separate

22   Statement of Disputed and Undisputed Material Facts ("PSS"), 21-25. Indeed, J&T Cattle Company,

23   which is in the business of feeding and raising cattle for Plaintiffs and third parties, is listed as an

24   additional insured on the policies. JSUF, 21; PSS, 4-5 [pg. 00495 of the Declarations page]. It would

25   defy logic, therefore, for Plaintiffs to pay for an insurance policy that basically excludes from coverage

26   nearly every aspect of their business operation.

27   Furthermore, Plaintiffs relied upon their trusted insurance broker of over ten (10) years, Brian

28   Stewart, to procure a policy with the adequate and agreed upon coverage for Plaintiffs' business and

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

1

1   personal interests. PSS, 17. Stewart assured Plaintiffs that Nationwide's policies would cover cattle

2   losses resulting from poisonous feed when they purchased the subject policies. PSS, 24. Yet,

3   Nationwide has refused to provide coverage for the loss.

**II.**

**FACTUAL BACKGROUND AND STATEMENT OF**
**UNDISPUTED AND DISPUTED MATERIAL FACTS**

7       Plaintiffs own and operate a livestock operation known as J&T Cattle Company, whereby they

8   raise beef cattle owned by them as well as beef cattle owned by others ("the Livestock Operation").

9   PSS, 1. Plaintiffs' Livestock Operation is principally located at 27552 Lake Road, La Grange,

10  California. PSS, 2.

11      On or around March 26, 2008, in consideration of Plaintiffs' payment of a premium, by and

12  through their trusted insurance broker of over ten (10) years, Brian Stewart, Plaintiffs purchased

13  comprehensive farmowner's insurance including (a) auto insurance, (b) Farm Property/Farm Package

14  Policy for bodily injury and property damage, Nationwide FPK FMP 7812596125 1 (hereinafter "the

15  Farm Policy"), and (c) Farm Excess/Umbrella Liability Policy AMCO FPK FAEA 7812596125

16  (hereinafter "the Umbrella Policy"). JSUF,1; PSS 3. These policies will be referenced to hereinafter

17  collectively as "the Policies." Plaintiffs' Livestock Operation at 27552 Lake Road is listed as an

18  insured location on the Farm Policy, (hereinafter "the Insured Premises"). PSS, 4. J&T Cattle

19  Company is listed as an "additional named insured." PSS, 4.

20      The Farm Policy provides that "[w]e will pay for direct physical loss of or damage to Covered

21  Property at the 'insured location' described in the Declarations ... caused by or resulting from any

22  COVERED CAUSES OF LOSS.'" PSS, 6.

23      The Farm Policy also provides that Defendants "will pay those sums that the insured becomes

24  legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this

25  insurance applies." PSS, 7. Despite this broad third-party liability coverage, the Farm Policy contains

26  an exclusion for damages relating to the insureds' "business pursuits," as well as "custom farming,

27  custom feeding and farm management" by the insured. JSUF, 13. However, the Farm Policy also

28  contains a broad Livestock Operations Coverage Endorsement. PSS, 8.

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

2

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1    When they purchased the Policies, Plaintiffs believed Brian Stewart to be their broker, but

2    understood that he was also authorized by Defendants to transact business of insurance on their behalf.

3    PSS, 9. Stewart is identified as the agent on the subject Policies. PSS, 10. Based on their long-

4    standing personal and professional relationship with Stewart, and the fact that Stewart and his father

5    before him, handled all of Plaintiffs' personal and business insurance needs since 1996, Plaintiffs

6    considered Stewart to be in a position of trust and confidence with them. PSS, 11-12. Stewart was

7    very familiar with Plaintiffs' personal and business needs, having procured insurance for *all* of

8    Plaintiffs' needs from medical and tenant insurance to the comprehensive farmowner's package at issue

9    in this case. PSS, 13. Accordingly, Plaintiffs relied entirely on Stewart to provide adequate and agreed

10   upon coverage for Plaintiffs and to inform them of any contrary provisions in the policies. PSS, 14-15.

11   Stewart was responsible for explaining the Policies to Plaintiffs. PSS, 16.

12       From March of 1996 to March of 2007, Plaintiffs purchased their farm policies from Fireman's

13   Fund, which was selected and procured for Plaintiffs' by Stewart and by his father before him. PSS,

14   17. During the heat-wave of 2006, Plaintiffs suffered loss when they had to reimburse a client for the

15   heat-related deaths of approximately 147 head of cattle on Plaintiffs' Livestock Operation. PSS, 18.

16   After that loss, Stewart informed Plaintiffs that their Fireman's Fund policy did not provide coverage

17   for losses resulting from acts of God such as the heat-wave. PSS, 19. Accordingly, when Stewart

18   sought to renew Plaintiffs' insurance policies the following March of 2007, he advised Plaintiffs to

19   switch from Fireman's Fund to the Nationwide/Allied farm policy. PSS, 20. In addition, Plaintiffs

20   expressed to Stewart their concerns about losses related to contaminated feed, since a local dairy had

21   suffered substantial loss after being fed botulism-tainted hay. PSS, 21. Plaintiffs discussed with

22   Stewart that if such an event occurred on their Livestock Operation, they would not be able to sustain

23   the out-of-pocket losses and would therefore need adequate coverage for the same. PSS, 22.

24       Plaintiffs understood, based on Stewart's representations to that effect, that Stewart was

25   researching the most suitable policy for Plaintiffs based on their needs and concerns. PSS, 23.

26   Thereafter, Stewart specifically advised Plaintiffs to switch to Nationwide because, according to

27   Stewart, Nationwide's Farm Policy would cover the damage to cattle excluded under the Fireman's

28   Fund policy, including consumption of poisonous/contaminated feed. PSS, 24. Based on Stewart's

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  representations, and because they trusted him, Plaintiffs purchased the Policies selected by Stewart.

2  PSS, 25.

3      Stewart did not disclose or explain to Plaintiffs the meaning or existence of the terms "custom

4  care and feeding" in the Policies or that the Policies contained a "custom care and feeding" exclusion,

5  and neither did Defendants.  PSS, 26.  Nor did Stewart or Defendants inform Plaintiffs that there was a

6  specific exclusion in the Policies for losses resulting from Plaintiffs' "business pursuits" or for harm

7  assumed by Plaintiffs pursuant to a contract.  PSS, 27.  Nor did anyone, including Stewart, advise

8  Plaintiffs of any "custom care and feeding coverage endorsement."  PSS, 28.  The only additional

9  coverage that Stewart mentioned to Plaintiffs prior to their purchase of the Policies related to a catchall-

10  type endorsement that Stewart said would cover every other eventuality not typically covered, but that

11  such a policy was expensive (roughly $5,000-$6,000 per month), was more typical in mid-western

12  states, and was not something Plaintiffs really needed.  PSS, 29.

13      From March through May of 2008, Plaintiffs and a business associate, Parvis Kamangar,

14  purchased 1,153 head of cattle having an average weight of 290 pounds.  PSS, 30.  All of the cattle

15  were transported to Plaintiffs' Livestock Operation on the Insured Premises.  PSS, 31.

16      Some of the cattle began dying suddenly in August of 2008 and were dying at alarming rates by

17  September and October of 2008.  PSS, 32.  Before they died, the cattle exhibited bloody and watery

18  stool accompanied by convulsions and the excretion of a foamy substance from their eyes.  PSS, 33.

19  Plaintiffs immediately began trying to treat and save any potentially infected animals while

20  investigating the cause of the harm.  PSS, 34.  When the cattle initially started dying, the death rates

21  were still not above the normal rates for Plaintiffs' operation for the time of year.  PSS,35.

22  Nonetheless, Plaintiffs immediately sought medical attention for the sick and dying animals and had

23  four of the dead animals evaluated by veterinarian J. D. Biwer, DVM.  PSS, 36.  By November of 2008,

24  nearly 2,000 head of cattle had been affected, approximately 320 died and 810 went sent to early

25  slaughter in November of 2008 at low butcher price.  PSS, 37.  About three-quarters of the affected

26  cattle were forwarded contracted for sale at specified prices ($1.04-$1.08 per pound), well above the

27  then-current market rate and were scheduled to be slaughtered in the Spring and early Summer of 2009

28  at an average of 1,312 pounds.  PSS, 38.  Additionally, Plaintiffs observed damage to older cattle

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

1   (weighing approximately 800-900 pounds each) beginning in November of 2008. PSS, 39. Cattle

2   continued to become ill and die until January of 2009 and later. Sixteen (16) of the animals that died

3   were owned by a third-party (Jason Roth), and Plaintiffs reimbursed Roth approximately $16,000

4   therefrom. PPS, 40.

5         Plaintiffs promptly contacted Nationwide to make a claim for coverage for the cattle loss on

6   October 2, 2008. PSS, 41; JSUF, 25. Plaintiffs notified Nationwide that they were still in the process

7   of investigating the damage but that Plaintiffs believed the animals had ingested contaminated feed.

8   PSS, 42. Plaintiffs informed Nationwide that Plaintiffs were still investigating the cause of death of the

9   animals. PSS, 43. Despite this, Nationwide sent a letter to Plaintiffs the very next day (October 3,

10  2008), stating that the Farm Policy did not cover "heads of cattle unless they are specifically scheduled

11  in the declarations page." JSUF, 26. In that letter, Nationwide advised Plaintiffs that "if you believe

12  that our understanding of the facts underlying the claim is incorrect, or s***hould you have any additional***

13  ***information that you feel may alter our decision,*** please advise our office immediately." PSS, 44

14  (emphasis added). Furthermore, Nationwide's letter concluded with reference to the suit limitation

15  provision in the Farm Policy of one year "after the date on which the direct physical loss or damage

16  occurred," and contained the following statement:

17          Based upon this Condition, and the time allowed to investigate your claim, you
        would have until May 21, 2009 to bring action ***or submit new information to be***

18          ***reviewed***. Any claims made or paperwork received after this date may be denied.

19  PSS, 45 (emphasis added). There is no explanation why Nationwide selected and used the arbitrary

20  date of May 21, 2009 when the cattle did not even begin to show signs of injury until in or around

21  August of 2008 at the earliest. PSS, 46. Because of the continuing and deteriorating nature of the harm

22  suffered by the cattle, Plaintiffs damages did not become appreciable until they determined there was

23  no way to stop the deaths, forcing them to slaughter a the remaining cattle, as calves, in November of

24  2008, at below market cost and well below their target weights. PSS, 47-48.

25        Meanwhile, as Plaintiffs' counsel notified Nationwide during their October 2, 2008 telephone

26  call, Plaintiffs were actively investigating the cause of their progressive cattle loss and began receiving

27  necropsy reports in September and October of 2008 that were performed on a sample of the infected

28  animals by the University of Arizona and by the University of California at Davis. PSS, 49. Plaintiffs

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

5

1   were still trying to treat and save any infected animals. PSS, 50. The necropsies established that the

2   cattle sustained severe damage to their livers, consistent with chronic poisoning by toxic plants

3   containing pyrrolizidine alkaloids. PSS, 51.

4        During the relevant time period, Plaintiffs purchased all of their alfalfa from Associated Feed &

5   Supply Company in Turlock, California ("Associated"). PSS, 52. A substantial portion of which was

6   traced to Stokes Ranch (also known as "Stokely Orchards"). PSS, 52. On October 27, 2008, Plaintiffs

7   retained forensic agronomist, Dale W. Rush, Ph.D, who inspected Stokes Ranch to determine whether

8   any toxic plants containing pyrrolizidine alkaloids existed on the Stokes properties. PSS, 53. Dr. Rush

9   found large amounts of common groundsel and hemlock on the Stokes ranches, weeds known to

10   contain large quantities of pyrrolizidine alkaloids. PSS, 54. Plaintiffs learned from Dr. Rush that once

11   ingested, pyrrolizidine alkaloids typically result in progressive liver failure. PSS, 55. This finding was

12   consistent with the necropsies. PSS, 55.

13        In or around October of 2008, Plaintiffs also learned that there is no known remedy for

14   pyrrolizidine alkaloid poisoning and therefore, Plaintiffs were forced to mitigate their damages. PSS,

15   56. Plaintiffs had to obtain the necessary clearances from the Department of Food and Agriculture to

16   sell the cattle in November of 2008. PSS, 56.

17        Plaintiffs filed suit against Associated and the Stokely parties on April 1, 2009 (Gaylord v.

18   Associated Feed & Supply Co., et al., Stanislaus County Superior Court Case No. 639262, (hereinafter

19   "the Associated Feed Action"). PSS, 57.

20        Between the date of their initial claim, October 2, 2008, and the April 13, 2009 date of Ted

21   Gaylord's recorded statement to Nationwide, Plaintiffs were compiling information in preparation for

22   the Associated Feed Action. PSS, 58. This entailed not only examination of the dead and dying

23   animals, but also investigation, tracing and sampling (among other things) of the feed. PSS, 58.

24   Promptly upon substantial completion of the same and their filing of the Associated Feed Action,

25   Plaintiff Ted Gaylord was able to submit to the telephone interview with Defendant on April 13, 2009.

26   PSS, 59; JSUF, 34. Accordingly, while Defendants cast Plaintiffs and their attorneys as dilatory in

27   responding to Defendants' requests for information, Plaintiffs were engaged in extensive fact-gathering

28   up to and including April of 2009. PSS, 59.

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1   On April 29, 2009, Defendants sent Plaintiffs a letter denying coverage for the loss of the cattle

2   but stating that "Nationwide and AMCO will reconsider its coverage position based on the allegations

3   of the suit and any additional and/or different information provided to Nationwide and AMCO at that

4   time." JSUF, 35; PSS, 60.  In a letter dated May 8, 2009, Kamangar's counsel (Ted Frame) sent a letter

5   to AMCO setting forth the following:

> We have reviewed your insured's policy.  We conclude that there is coverage
> under the Livestock Operations endorsement.  While there may be some
> uncertainty as to whether 'Livestock Operations' include your insured's cattle
> feeding, we think it fair to say that your insured had, at the very least, a
> reasonable expectation of coverage.  **Feeding cattle was and is an integral part
> of your insured's livestock operation, and the agent who wrote the policy was
> fully aware of that fact.**

PSS, 61 (emphasis added).

11   On September 11, 2009, Kamangar filed an action for breach of contract and negligence against

12   Plaintiffs for the death of his cattle. JSUF, 36.  Plaintiffs provided Defendants a copy of the complaint

13   and Defendants recognized receipt of the same on October 29, 2009.  PSS, 62.  Defendants reopened

14   their investigation and referred the matter to coverage counsel who provided Plaintiffs a formal, written

15   denial of the claim on January 10, 2009.  JSUF, 37.

### III.

### LEGAL ARGUMENT

**A.   STANDARD ON MOTION FOR SUMMARY JUDGMENT**

This Court recently articulated the standard on summary judgment as follows: "[s]ummary

judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material

fact, and that the moving party is entitled to judgment as a matter of law." Dias v. Nationwide Life

Insur. Co., 700 F. Supp. 2d 1204, 1213 (E.D. Cal. 2008); citing, Adickes v. S.H. Kress & Co., 398 U.S.

144, 157 (1970); see also, Fed. R. Civ. P. 56(c).  "The moving party always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of

'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'"

McGranahan v. Insurance Corp. of NY, 544 F. Supp. 2d 1052, 1056 (E.D. Cal. 2008); citing, Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its initial obligation, the burden

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

7

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1   shifts to the opposing party to establish that a genuine issue of material fact exists. Id.; citing,

2   Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986), and First Nat'l

3   Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). "Material facts are those which may

4   affect the outcome of the proceedings." Flintkote Co. v. General Acc. Assur. Co. of Canada, 480 F.

5   Supp. 2d 1167, 1171 (N.D. Cal. 2007; citing, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

6   (1986). A material fact is disputed if there is sufficient evidence for a reasonable jury to return a

7   verdict for the nonmoving party. Id.

8        It is well-settled that a court may not make credibility determinations or weigh conflicting

9   evidence at the summary judgment stage. See Flintkote, 480 F. Supp. at 1172; see also Anderson, 477

10  U.S. at 249. "[I]nferences drawn from the facts must be viewed in the light most favorable to the party

11  opposing the motions. Id.; citing, Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991). **"The**

12  **evidence of the party opposing summary judgment is to be believed and all reasonable inferences**

13  **that may be drawn from the facts before the court must be drawn in favor of the opposing**

14  **party."** Dias, 700 F. Supp. 2d at 1214, (emphasis added); see also, Dairy America, Inc., 2010 WL

15  2102716, 6.

16       "Moreover, given that 'statutes of limitations are affirmative defenses,' (citation) a defendant

17  seeking summary judgment on an affirmative defense 'must establish beyond peradventure *all* of the

18  essential elements of the … defense to warrant judgment in his favor.'" Dairy America, 2010 WL

19  2102716, at 7 (emphasis in original).

20  **B.    PLAINTIFFS ARE ENTITLED TO PURSUE THEIR FIRST PARTY CLAIM**
        **BECAUSE THE LIMITATIONS PERIOD WAS EQUITABLY TOLLED DURING THE**
21      **PARTIES' INVESTIGATION OF THE CLAIM**

22       Plaintiffs' first party claim against Nationwide is not time-barred, because (a) Defendants

23  appear to be using an improper and arbitrary accrual date of May 21, 2008, which can only logically

24  correspond to Plaintiffs' feeding of the infected hay, but otherwise has nothing to do with the dates

25  Plaintiffs suffered appreciable and/or continuing harm; (b) Defendants did not unequivocally deny

26  / / /

27  / / /

28  / / /

1   Plaintiffs' October 2, 2008 claim in Defendants' letter dated <u>the next day</u>,[1] which letter indicated to

2   Plaintiffs that they could *either* make a claim or *present further or additional information for*

3   *Defendant's review* within the time set forth, which Plaintiffs did; and (c) under California law, the

4   running of the statute was equitably tolled while Defendants considered the additional information

5   presented by Plaintiffs.  The issue of *when* Plaintiffs started suffering "appreciable," or "continuing"

6   harm since the nature of the damages here are "cumulative and deteriorating" in nature, is itself a

7   *question of fact*.  <u>See</u> <u>Montrose Chemical Corp. v. Admiral Ins. Co. (Montrose II)</u>, 10 Cal. 4th 645, 674

8   (1995).  Nonetheless, the statute was tolled (at least) from Plaintiffs' October 2, 2008 notice of the

9   claim until Defendants' April 29, 2009 denial letter, ran for 6 months, and then was tolled again on or

10  around October 29, 2009 when Defendants granted Plaintiffs reconsideration and reopened the claim,

11  until coverage was finally and unequivocally denied in counsel's letter of January 10, 2010, i.e., a total

12  of approximately 7 ½ months.

13      **1.      The Principle of Equitable Tolling Applies To Plaintiffs' First Party and Bad Faith**
              **Claims**

14

15          In <u>Prudential-LMI Com. Insurance v. Superior Court</u>, 51 Cal. 3d 674, 687 (1990), the California

16  Supreme Court announced the rule that in first-party progressive property damage cases (governed

17  under the California Insurance Code § 2071 one-year limitations period applicable to fire policies), the

18  limitations period begins to run "when ***appreciable*** damage occurs and is or should be known to the

19  insured, such that a reasonable insured would be aware that his notification duty under the policy has

20  been triggered." (Emphasis added.)  The Court further held that the determination of ***when*** appreciable

21  damage occurs is a **factual matter to be decided by the trier of fact**.  <u>Id.</u>  Furthermore, equitable

22  tolling applies to postpone the running of the one-year limitation provision from the date the insured

23  notifies the insurer of its claim until the insurer provides a formal and unequivocal denial of the claim.

24  <u>Id.</u>, 678.  Moreover, while an insured's *request* for reconsideration typically does not toll the statute

25  (<u>see</u> <u>Singh v. Allstate Ins. Co.</u>, 63 Cal. App. 4th 135, 142 (1998)), an insurer's *agreement* to reconsider

26

27  _____

28      [1] Conspicuously absent from Defendants' points and authorities is the actual date of Plaintiffs' claim
    notification, October 2, 2008. <u>See</u> Defendants' Memorandum of Points and Authorities, 8:16-19.

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

and reopen the matter does.  See Ashou v. Liberty Mut. Fire Ins. Co., 138 Cal. App. 4th 748, 762 (2006) [insurers reopening and reconsideration of claim equitably tolled the one-year statutory revival period for filling such claims].  Furthermore, the policy justifications underlying Singh do not apply here.

In San Jose Crane & Rigging, Inc. v. Lexington Ins. Co., 227 Cal. App. 3d 1314, 1316 (1991), the appellate court was called upon to determine whether the principal of equitable tolling in Prudential-LMI applied in the context of a commercial all-risk insurance policy, and the court concluded that it did.  The San Jose Crane Court held that "[i]rrespective of the equitable tolling issue, however, this case was not an appropriate one for summary judgment," because, "**[t]he determination of when *appreciable* damage occurs, which would trigger the running of the 12-month period, is a factual matter which should have been submitted to the jury.**"  Id. (emphasis added).

In San Jose Crane, plaintiffs operated a crane rental business and rented a crane to Coastal Sulfur for purposes of supporting the removal and unloading of a huge pile of sulfur.  Id., 1316.  On December 14, 1985, plaintiffs' agent noticed that a sulfur pile was beginning to encroach the crane's supports and asked Coastal Sulfur to move the pile, which it promised to do but never did.  Id. Three-days later, plaintiffs' agent discovered that the sulfur had continued to build up and demanded again that the pile be removed.  Id.  By December 24, 1985, the crane was completely buried.  Id.  When it was removed on January 3, 1986, plaintiffs' agent inspected the crane and concluded that it "looked fine," however, when the manufacturer examined it on January 9th, it came to a different conclusion.  Id.  The manufacturer issued a report dated January 23, 1986 concluding that the crane was irreparably damaged by the corrosive effects of the sulfur.  Id., 1317.  On February 16, 1986, plaintiffs submitted the claim to their commercial 'all-risk' insurer, which orally denied the claim shortly after June 5, 1986. Id.  After plaintiffs threatened to sue, the insurer requested additional information to obtain a coverage opinion and reconsider the claim, and then denied the claim again on August 25, 1986.  Id.  Plaintiffs submitted additional information and requested another reconsideration, which was also denied in writing on October 30, 1986.  Id.  After further negotiation, the insurer denied the claim a fourth time on December 16, 1986, 1 year and 17 days after the first sulfur was seen on the crane's supports.  Id. / / /

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Plaintiffs argued they were not appreciably damaged until January 23, 1986 when the

2    manufacturer told them the crane was irreparable, because prior to that time the crane looked fine. Id.,

3    1318.  Moreover, since neither pure sulfur nor sulfur mixed with water corrode metal, plaintiffs were

4    not on notice that corrosion was occurring.  Id.  The Court reiterated that the **question of when**

5    **appreciable damage occurred was one for the trier of fact** and therefore denied the insurer summary

6    judgment. Id.

7        Although the present action deals with a comprehensive policy that is both personal and

8    commercial in nature, the principle of Prudential-LMI still applies as evidenced by the San Jose Crane

9    analysis. See also, Flintkote Co. v. General Acc. Assur. Co. of Canada, 480 F. Supp. 2d 1167, 1179

10   (N.D. Cal. 2007).  In Flintkote, the District Court explained that "Prudential-LMI's analysis of the

11   accrual of a cause of action was clearly limited to the property loss context." Id.; cf. Montrose II, 10

12   Cal. 4th at 685 [distinguishing Prudential-LMI and adopting the continuous injury trigger of coverage

13   analysis for progressive injury under third-party liability policies].  The Flintkote Court noted that

14   neither Prudential-LMI nor subsequent cases hinted at why the equitable tolling doctrine should be

15   limited to the first-party property loss scenario.  Id.  Indeed, "equitable tolling has not been confined by

16   California courts to the context of progressive property loss under a homeowner's policy." Id., citing,

17   San Jose Crane, 227 Cal. App. 3d 1314 (applying equitable tolling to commercial property loss);

18   Forman v. Chicago Title Ins. Co., 32 Cal. App. 4th 998 (1995) (applying equitable tolling to the two-

19   year statute of limitations applicable to title insurance under Cal. Code of Civ. Proc. § 339(1)).  Prior to

20   Flintkote, it appears that no California court had applied equitable tolling to commercial liability

21   claims. Id., 1179.

22       In Flintkote, the California Supreme Court adopted the "continuous trigger theory" of accrual

23   for claims of "continuous or progressively deteriorating damage or injuries" such as those relating to

24   asbestos-exposure. Flintkote, 1174; citing, Montrose II, 10 Cal. 4th at 674 [concluding that the

25   continuous trigger theory conforms to the reasonable expectations of the insured in light of the

26   "cumulative and deteriorating nature" of asbestos-related injuries].  These were asbestos-related cases,

27   which are akin to the consumption of poisonous feed situation here because the injuries resulting from

28   the harm were progressive and ongoing.

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

11

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1    Certainly, triable issues of fact exist as to whether or not the one-year limitations provision has

2  run on plaintiffs' first party claim.  The one-year limitations provision in the Farm Policy applies only

3  to the property coverage portion of the Farm Policy (i.e., first party claim) and to the bad faith claim

4  relating to the first party denial to the extent it is deemed "on the policy."[2]   JSUF, 11.  Although

5  Nationwide sets forth an arbitrary and unexplained accrual date of May 21st in its October 3, 2008

6  letter, the date or dates upon which Plaintiffs sustained *appreciable* damage and/on *continuing and*

7  *deteriorating* loss to trigger the statute of limitations would be a question of fact.  Furthermore, triable

8  issues of fact remain as to equitable tolling of the limitations provision.

9    The nature of Plaintiffs' damages in this case are more akin to the type of damages at issue in

10  Flintkote and Montrose II, i.e., continuous or progressively deteriorating, cumulative and deteriorating.

11  As in asbetos-exposure cases, the cattle that consumed the contaminated feed did not begin to show

12  signs of damage or injuries until August of 2008 but the older cattle were not symptomatic until

13  November of 2008.  PSS, 39.  Cattle did not start dying at alarming rates until September of 2008, the

14  speculated cause of death was not known until late-September or early October 2008, and the

15  determination to prematurely slaughter the cattle in order to mitigate the catastrophy was made in

16  October-November 2008.  PSS, 37.  Cattle continued to be ill and die until January of 2009 and later.

17  Accordingly, the "continuous trigger" approach to calculating the statute would be more appropriate.

18  Even applying the appreciable damage approach however, it is evident that Plaintiffs' damages were

19  *not* appreciable in May of 2008, as Defendants would like the Court to believe.  From August to about

20  October 2008, Plaintiffs were scrambling to determine the cause of death and potential cures.  Not until

21  Plaintiffs the results from necropsies and the discovery of potential groundsel contamination, did

22  Plaintiffs realize that they would have to move quickly to mitigate their damages.  Therefore, the

23  damages did not become appreciable until that point in time, arguably October 2008, at the earliest.

24

25

---

26    [2]Indeed, it is well-settled that the duty to defend is continuing, and that the limitations period is equitably
   tolled from the time the cause of action accrues – upon the insurer's refusal to defend – until the underlying lawsuit is
27  terminated by a final judgment.  Eaton Hydraulics Inc. v. Continental Cas. Co., 132 Cal. App. 4th 996, 973 (2005);
   citing, Lambert v. Commonwealth Land Title Ins. Co., 53 Cal. 3d 1072, 1077 (1991).  It follows that Plaintiffs' bad
28  faith claim as it relates to Defendants' denial of the third-party claim does not begin to accrue until final judgment in
   that action as well.

*Damrell Nelson
Schrimp Pallios
Pacher & Silva*
*A Professional
Corporation*

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   Further, Plaintiffs did not sustain the majority of their losses until they sent the remaining cattle (i.e.

2   810 head) to premature slaughter in early November 2008. PSS, 37. Therefore, there is triable issue

3   regarding the accrual of Plaintiffs' claim.

4           **2.      Application of Equitable Tolling to the Claim Here**

5           When it became apparent that there was a good likelihood of feed contamination, but before

6   Plaintiffs were certain about the cause of death or the availability of a cure, they promptly notified

7   Nationwide of their claim on October 2, 2008. PSS, 41. According to <u>Prudential-LMI</u>, the statute was

8   tolled from the October 2, 2008 notice of claim until Defendant's unequivocal denial of the claim.

9   Plaintiffs dispute that the October 3, 2008 letter amounted to an unequivocal denial, because (a)

10  Nationwide responded to the claim in a day's time, certainly evidencing that an appropriate

11  investigation had not been performed (b) and they requested additional information for review, despite

12  knowing that Plaintiffs had just started extensive investigations into the deaths. PSS, 44. Furthermore,

13  as set forth below, Nationwide's October 3, 2008 letter was ambiguous.

14          The letter quotes the "1-year after the date on which the direct physical loss or damage

15  occurred" language from the Farm Policy, but sets forth that Plaintiffs had until May 21, 2009 to *either*

16  "bring action *or* submit new information to be reviewed" by Nationwide. JSUF, 27; PSS 45. This

17  letter is inherently ambiguous because (a) the May of 2008 period does not correspond to any dates of

18  injury in this case,[3] and (b) one year from the date of the direct physical harm should be sometime in

19  November of 2009, since Plaintiffs were forced to prematurely slaughter the remaining animals at a

20  substantially reduced price and at substantially lower weights in November of 2008. PSS, 37-38.

21  Furthermore, contrary to the allegations in Defendants' moving papers, Defendants did provide

22  Nationwide further information before the May 21, 2009 date set forth in the letter. Indeed, on

23  April 13, 2009, Ted Gaylord submitted to a recorded interview whereby he set forth the results of

24

25

26  _____

27  [3]Perhaps Nationwide is basing its May accrual date on Plaintiffs' statements that the contaminated feed was purchased and/or fed between May and June of 2008. However, this date is totally unreasonable since Plaintiffs suffered no damages during that time. The cattle did not even exhibit signs of distress until August of 2008 *at the*

28  *earliest* and did not start dying at alarming rates until September and October of 2008. PSS, 32.

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

13

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1   Plaintiffs' investigations as well as the basis of Plaintiffs' claims in the Associated Feed Action. PSS,

2   59. Gaylord was thereby providing Nationwide the "additional information" Plaintiffs had been

3   compiling. PSS, 58-59. This alone raises a triable issue of fact. See San Jose Crane, 227 Cal. App. 3d

4   at 1316.

5       On April 29, 2009, Nationwide sent a letter denying Plaintiffs' claim. PSS, 60. Although the

6   letter focused on the third party claim, Plaintiffs believed Defendants were still investigating the first

7   party claims as well, since the two claims were based on the same course of events, i.e., the

8   consumption of the contaminated feed that Plaintiffs were still investigating. PSS, 58. That letter

9   concluded that Defendants would not provide coverage for the claims, but refers to Plaintiffs having "a

10  50% equity share" in the lost cattle. PSS, 60. In the second paragraph of the letter, Defendants notify

11  Plaintiffs that if they are served with suit, to forward copies to Defendants and that Defendants "will

12  reconsider its coverage position based on the allegations of the suit and any additional and/or difference

13  information provided to Nationwide and AMCO at that time." PSS, 60.

14      Accordingly, the statute was triggered on October 2, 2008 (at the earliest) and tolled from that

15  date to the April 29, 2009 date of the denial, though the first party claim had arguably still not been

16  unequivocally denied. The statute, therefore, began to run from April 29, 2009 until Defendants

17  acknowledged receipt of the Kamangar Complaint on October 29, 2009. PSS, 62 (exactly 6 months).

18  Pursuant to Ashou, the statute was tolled again from October 29, 2009 until the January 12, 2010

19  formal and unequivocal denial letter from Defendants. The statute then began to run again from

20  January 12 until Plaintiffs filed this action on March 4, 2010 (just under 2 months). In sum, the statute

21  only ran for approximately 8 months.

22  **C.   THE POLICIES SHOULD BE INTERPRETED IN FAVOR OF COVERAGE IN LIGHT**

23  **OF PLAINTIFFS' REASONABLE EXPECTATIONS AND ACCORDING TO THE REPRESENTATIONS MADE BY STEWART**

24      California Courts will give effect to the mutual intentions of the parties to an insurance contract

25  as well as the reasonable expectations of the insureds where, as here, there are policy provisions subject

26  to more than one reasonable interpretation. See Dairy America, Inc. v. New York Marine and General

27  Ins. Co., 2010 WL 2102716, 8 (E.D. Cal., 2010). Here, the plain meaning of the "Livestock

28  Operations" endorsement contradicts the terms of the exclusions, and under California law, the

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  language of the endorsement prevails.  See Haynes v. Farmers Ins. Exchange, 32 Cal. 4th 1198, 1208

2  (2004).

3        1.        **Contract Interpretation Rules Under California Law Support Plaintiffs'
                   Interpretation of the Policies.**

4

5        This Court recently summarized the standard in California for its analysis and interpretation of

6  insurance contracts as follows:

7        The California Supreme Court has established a three-step process for analyzing
         insurance contracts with the primary aim of giving effect to the mutual intent of

8        the parties." In re K F Dairies, Inc. & Affiliates v. Fireman's Fund Ins., 224 F. 3d
         922, 925 (9th Cir.2000) (citing AIU Ins. Co. v. Superior Ct., 51 Cal. 3d 807, 821-

9        823 (1990)). 'The first step is to examine the 'clear and explicit' meanings of the
         terms as used in their 'ordinary and popular sense.'  In re K F Dairies, 224 F. 3d

10       at 925 (quoting AIU Ins., 51 Cal.3d at 822. '**[I]f the meaning a layperson would
         ascribe to contract language is not ambiguous, we apply that meaning.**  AIU

11       Ins., 51 Cal. 3d at 822.

12       If an insurance policy term is ambiguous, a court 'proceeds to the second step and
         resolves the ambiguity 'by looking to the expectations of a reasonable insured.'

13       In re K F Dairies, 224 F. 3d at 926 (quoting Bay Cities Paving & Grading, Inc. v.
         Lawyers' Mut. Ins. Co., 5 Cal. 4th 854, 875 (1993)). '**Under California law, an

14       insurance policy provision is 'ambiguous when it is capable of two or more
         constructions both of which are reasonable.'**  In re K F Dairies, 224 F. 3d at

15       926 (quoting Bay Cities, 5 Cal. 4th at 875).

16       If the ambiguity remains, 'it is construed against the party who caused the
         ambiguity to exist.'  In re K F Daires, 224 F. 3d at 926 (citing AIU Ins., 51 Cal.

17       3d at 822).  'In the insurance context, this almost always is the insurer, as the
         California Supreme Court has held that ambiguities are generally resolved in

18       favor of coverage ... and that the courts are to 'generally interpret the coverage
         clauses of insurance policies broadly, **protecting objectively reasonable

19       expectations of the insured.'**  In re K F Dairies, 224 F. 3d at 926 (quoting AIU
         Ins., 51 Cal.3d at 822).

20  Dairy America, Inc., 2010 WL 2102716 at 8, (emphasis added).

21       This Court went on to explain that "'[t]he burden of making coverage exceptions and

22  limitations conspicuous, plain and clear rests with the insurer.'"  Id.; citing, Haynes v. Farmers Ins.

23  Exchange, 32 Cal. 4th 1198, 1204 (2004).  The interpretation of a contract, including the resolution of

24  ambiguities, is a judicial function only until the interpretation turns on *the credibility of extrinsic*

25  *evidence.*  Id., 9; citing, American Alternative Ins. Corp. v. Superior Court, 135 Cal. App. 4th 1239,

26  1245 (2006).  Where such interpretation "**rests on credibility of conflicting extrinsic evidence,**" it is

27  for the **trier of fact** to decide.  Id.  This Court also reiterated that fundamental rules of contract

28  / / /

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   interpretation are based on effectuating the parties' mutual intention and that such intention "at the time

2   the contract is formed" is what governs its interpretation. Id., 9.

3        Dairy America dealt with the interpretation of a two-year suit limitation provision in a general

4   commercial all risk policy issued by Hartford to Dairy America, a company that markets and sells

5   powder milk products worldwide. Id., 1.  On August 29, 2005, Hurricane Katrina destroy property of

6   Dairy America.  Dairy America filed a lawsuit against its cargo insurer, amended to add its broker, and

7   amended again on May 14, 2008 to add Hartford. Id., 5.  The subject policy (as to Hartford) read as

8   follows:

9            No suit or action on this policy for the recovery of any claim shall be sustainable
             in any court of law or equity unless . . . commenced within twenty four (24)
10           months next after inception of the loss, unless a longer time is provided by
             applicable statute.

11

12   Id., 2.  Hartford moved for summary judgment on grounds that the 24-month limitations period expired

13   on March 9, 2008, more than 60 days prior to naming Hartford as a defendant. Id.  Dairy America

14   argued that the four-year statute of limitations for contract actions in California Code of Civil

15   Procedure § 337's should apply and that equitable estoppel tolled the statute since Hartford

16   misrepresented and concealed evidence from Dairy America. Id.

17        This Court applied California rules of contract interpretation to determine what the parties

18   intended by the term 'unless a longer time is provided by applicable statute,' language in the limitation

19   provision. Id.  This Court interpreted the provision to be referring to the longer statute of limitations in

20   Code of Civil Procedure § 337. Id.

21        In the present case, the Court should find that the "Livestock Operations" endorsement while

22   not defined, is ascribed the meaning a layperson would give i.e., a cattle operation like Plaintiffs' where

23   cattle are fed and raised for a fee. See Dairy America, 2010 WL at 8; AIU Ins., 51 Cal. 3d at 822.

24   Alternatively, if the term is deemed ambiguous, undefined, and/or susceptible to more than one

25   reasonable meaning, the Court must leave for the trier of fact the task of interpreting the Policies. Id.;

26   In re K F Dairies, 224 F. 3d at 926.

27   / / /

28   / / /

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

16

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

2.     **Plaintiffs Are Entitled to Rely on the Broad "Livestock Operations" Endorsement in the Farm Policy as Controlling Coverage Here, Because Endorsements Govern Over Exclusionary Provisions in the Policies.**

It is well-settled under California law that "where the terms of an effective endorsement conflict with terms in the main body of [] a policy, the endorsement controls." Haynes, 32 Cal. 4th 1198, 1208 (2004); see also, Continental Casualty Co. v. Phoenix Construction Company, 46 Cal. 3d 423, 431 (1956), citing Fageol Truck & Coach Co. v. Pacific Indemnity Co., 18 Cal.2d 731, 738 (1941).

The California Appellate Court applied this principle in Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th 1436 (2007). In that case, Frontier Oil and its wholly owned subsidiary (collectively "Frontier Oil") contended their insurer had a duty to defend them in several personal injury actions arising from the operation of an oil and gas production facility in Beverly Hills. Id., 1442. After deciding that California law applied because the insurable interest was in California, the court looked to the language of the policy which provided 'bodily injury' and 'property damage,' coverage and provided that it "*will have the right and duty to defend any 'suit' seeking those damages*'"" Id., 1443 (emphasis in original). Exclusion "f" in the same coverage form provided an "'absolute' pollution exclusion'" excluding from coverage bodily injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants...."'" Id. However, the policy also contained several endorsements including one entitled "'Oil and Gas Lease Operators' Pollution Liability Coverage.'" Id., 1443-44. That endorsement deleted exclusion f from the policy and set forth that the insurer would pay the insured's liability "caused by a pollution incident" to which the insurance applied. Id., 1444. The endorsement did not mention a duty to defend. Id.

When Frontier Oil was sued for personal injuries relating to alleged releases of toxic chemicals, Frontier Oil tendered the defense to RLI. Id., 1444. RLI initially denied defense arguing Texas law governed and under Texas law, the endorsement did not create a duty to defend. Id., 1445. Frontier Oil filed suit against RLI for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. Id., 1445. RLI moved for summary judgment based on the same grounds as its earlier denial. Id.

/ / /

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

17

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1    The appellate court examined the choice-of-law rules as well as the contract interpretation rules

2  as articulated in the <u>Dairy America</u> analysis. <u>Id.,</u> 1447-51.  In sum, the appellate court found that

3  California law applied and that pursuant to the California rules of contract interpretation, RLI promised

4  to defend Frontier Oil against pollution claims with respect to its operations in Beverly Hills. <u>Id.,</u> 1464.

5  The court based its decision on the "mutual intention" of the parties "at the time the contract was

6  formed." <u>Id.,</u> 1462.  The court said that it would ascertain that intention solely from the written

7  contract if possible, but would "also consider **the circumstances under which the contract was made**

8  **and the matter to which it relates**." <u>Id.,</u> (emphasis added); citing Ca. Civ. Code §§ 1639, 1647.

9  Furthermore, the court said it would "consider the contract as a whole and interpret the language in

10  context, rather than interpret a provision in isolation." <u>Id.,</u> citing Ca. Civ. Code § 1641.  The court

11  reiterated that it would "**interpret an insuring clause broadly consistent with the reasonable**

12  **expectations of the insured**." <u>Id.,</u> 1462 (emphasis added).  The court further explained that "[a]n

13  endorsement modifies the basic insuring forms of the policy and is an integral part of the policy." <u>Id.,</u>

14  1463.  "If there is any conflict between an endorsement and the body of a policy, the endorsement

15  controls, provided that any reduction in coverage reasonably expected under the body of a policy must

16  be 'conspicuous, plain and clear.'" <u>Id.,</u> (emphasis added).

17    Here, the Livestock Operations Coverage Endorsement is not defined in the Policies and merely

18  provides that it "modifies insurance provided in the Farm Liability Coverage Form." PSS, 8.  Applying

19  a plain and ordinary meaning to the endorsement's language, *consistent with* Plaintiffs' reasonable

20  expectations, would result in coverage for Plaintiffs' cattle or "livestock" operation as understood by

21  Stewart and Plaintiffs, i.e., the feeding and raising of livestock for Plaintiffs and others.  The

22  endorsement would control the exclusions relating "custom care and feeding of livestock," contractual

23  liability, and business pursuits.

24  **3.     The Fact That "Livestock Operations" Is Not Defined Further Evidences The**
       **Existence of An Ambiguity In This Case and Therefore A Triable Issue of Fact.**

25

26    The California Supreme Court has held that while not necessarily *creating* ambiguity, "'in an

27  appropriate case, the absence of a policy definition, though perhaps not dispositive, might weigh, even

28  strongly, in favor of finding an ambiguity.'" <u>See</u> <u>American Alternative Ins. Corp. v. Superior Court,</u>

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

135 Cal. App. 4th 1239, 1247 (2006); citing, Bay Cities Paving & Grading, Inc. v. Lawyers Mutual Insur. Co., 5 Cal. 4th 854, 866-67 (1993).  American Alternative issued a broad aviation policy to the insured, a limited liability company whose sole member was a corporation owned by a defendant in pending felony investigations relating to child prostitution, exploitation and drug trafficking. Id., 1243. The policy provided that "'[t]he Company shall pay for *physical damage* to the *scheduled aircraft* including *disappearance* of the *scheduled aircraft*.'"  Id., 1242 (emphasis in original).  The policy contained a provision that required the insureds to "'protect the damaged property'" or forego coverage for "'any further *physical* damage."  Id., 1243 (emphasis in original).  The italicized terms were defined in the policy but the term "damaged property" was not defined. Id., 1242-43.

The sheriff in Bay County, Florida seized the plane, but the plane was subsequently released for lack of probable cause. Id., 1243.  The insureds filed a complaint against American Alternative alleging breach of contract, tortious breach of contract and declaratory relief and moved for summary judgment as to American's duties to (1) pay attorneys fees incurred to protect the aircraft after it was seized; (2) pay all amounts necessary to repair damage to the aircraft after it was seized; and (3) pay all expenses, including attorney's fees, incurred to repair and protect the aircraft. Id., 1243.  The parties filed for summary judgment.  Id.  The trial court granted the insureds' summary judgment on all three issues, construing "'damaged property'" in a manner consistent with the defined term "physical damage" to include loss of the aircraft (by seizure). Id., 1244.

American argued it was not liable for the costs and fees the insured incurred to retrieve the aircraft pursuant to the provision that American would have "'no obligation to pay for any further *physical damage* due to the *Named Insured's* failure to protect the damaged property.'"  Id., 1247. "Damaged property" was not defined.  Id.  The court held that while "the absence of a policy definition does not necessarily create an ambiguity, 'in an appropriate case, the absence of a policy definition, though perhaps not dispositive, might weigh, even strongly, in favor of finding an ambiguity.'"  Id. The court held that "damaged property" literally refers to property that has been damaged and that the ***ordinary meaning*** of "damaged" with reference to tangible property like an aircraft is "injured."  Id. Furthermore, the policy definition of "physical damage" appeared to use the term "damage" in its ordinary sense and was defined to include "physical loss of or damage" to the aircraft. Id., 1247-48.

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    So the court looked at the term in context with the other definition and determined that since the

2    defined term "physical damage" encompassed both injury and physical loss, so did the term "damaged

3    property." <u>Id.</u> 1248. "Consistent with this interpretation, 'to protect the damaged property' in this

4    context would include *both* prevention of further injury *and* prevention of further physical loss." <u>Id.,</u>

5    (emphasis in original). This interpretation was also consistent with the insureds' objectively reasonable

6    expectations. <u>Id.,</u>1249.

7         Here the Court should consider that *at the time the policy was purchased*, Plaintiffs were

8    operating a livestock operation and were purchasing a *comprehensive* farm and personal insurance

9    package to insure both their personal and business needs.  It would be anomalous for Plaintiffs to

10   purchase a policy that specifically excluded their business pursuits in the feeding and raising of

11   livestock.  Therefore, giving the "livestock endorsement" its ordinary and plain meaning would be in

12   keeping with the objectively reasonable expectations of the Plaintiffs.  While this endorsement may

13   conflict with the exclusionary terms of the policy relating to "custom care and feeding of livestock," the

14   law in this State is clear that the language of the endorsement should govern here. ."  <u>Haynes</u>, 32 Cal.

15   4th 1198, 1208 (2004).

16        **4.       Defendants Are Bound By Stewart's Coverage Representations Since Stewart Can
                    Be Deemed Defendants' Soliciting Agent When They Were Made**
17

18        In <u>Dias v. Nationwide Life Insur. Co.</u>, 700 F. Supp. 2d at 1213, plaintiffs Melvin and Evelyn

19   Dias purchased variable life insurance policies from Nationwide through their friend and financial

20   advisor, Pena. <u>Id.,</u> 1207-08.  Plaintiffs purchased a variety of investments through Pena over the years,

21   and the subject policies were recommended by Pena as a "good retirement investment" that after two

22   years would fund themselves. <u>Id.,</u> 1208.  Plaintiffs claimed Pena made a variety of representations

23   regarding the nature of the policies including that plaintiffs would not be required to pay premiums

24   after two years, but could invest more money in the policies as they desired. <u>Id.</u>  Pena denied these

25   statements, and this Court noted that it would **credit the plaintiffs' version of events since plaintiffs**

26   **were the non-moving parties**. <u>Id.</u>, fn. 4.  Melvin understood that the policies would increase over time

27   with the stock market but did not understand that they could also decrease if the stock market

28   decreased. <u>Id.</u>  This is even though plaintiffs signed applications for the policies on which they

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   answered "yes" to questions regarding whether or not they understood that the value of the policies

2   could increase or decrease. Id., 1209.

3       Plaintiffs' stopped making regular premium payments after two years of paying the premium

4   amounts of $98,050 and $96,319 for Melvin and Evelyn's policies respectively. Id., 1212. In

5   November of 2000, after the third anniversary of the policies, Melvin began receiving premium notices

6   from Nationwide. Id. When he asked Pena what to do about the notices, Pena told Melvin he was not

7   required to pay them as there was plenty of money in the policies. Id. While Melvin continued to

8   receive premium notices from 2003 to 2008, he only made payments in varying amounts from 2004 to

9   2007. Id. Nationwide did not send any premium notices to Evelyn until 2008, and both policies lapsed

10  in 2008 for nonpayment. Id., 1213.

11      In the spring of 2007, Melvin discovered that Pena had been stealing money from him and

12  changed brokers who then informed Melvin he had been a victim of 'vanishing premiums' fraud. Id.,

13  1212-13. The agent of record for plaintiffs' policies had been Pena, and although he had never been an

14  employee of Nationwide, he was a licensed insurance agent and an independent contractor appointed by

15  Nationwide to sell Nationwide policies. Id., 1211. Nationwide declared that it authorized Pena to

16  solicit applications on behalf of Nationwide, but did not authorize Pena to accept risks or contracts or

17  bind Nationwide. Id., 1212. Plaintiffs received periodic statements and letters from Nationwide

18  identifying Pena as the representative on the policies and advising them to direct any questions to Pena.

19  Id. The policies in Dias contained provisions cautioning the insured to "PLEASE READ YOUR

20  POLICY CAREFULLY" and advising them of their "RIGHT TO EXAMINE POLICY." Id., 1210.

21      Plaintiffs sued Nationwide for fraud, and Nationwide moved for summary judgment on grounds

22  that as a matter of law plaintiffs could not show (1) justifiable reliance on the alleged

23  misrepresentations; (2) that Nationwide was vicariously liable for Pena's misrepresentations, and (3)

24  that the action survived the statue of limitations. Id., 1207, 1215, 1219, 1222.

25      Just as Defendants attempt to do here, Nationwide cited Spray, Gould & Bowers v. Associated

26  International Ins. Co., 71 Cal. App. 4th 1260, 1272 (1999) and Hadland v. NN Investors Life Ins. Co.,

27  24 Cal. App. 4th 1578-1586 (1994), for the propositions that under California law, (1) there can be no

28  justifiable reliance on representations that are contrary to the express terms of the policy and (2) where

Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation

21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   an insured accepts a policy without reading it, the insured cannot complain that the policy was not what

2   the insured expected. <u>Id.</u>, 1215. This Court agreed with plaintiffs however that justifiable reliance is a

3   **question of fact** and ruled that it could be found that Melvin reasonably relied on Pena's

4   representations. <u>Id.</u>, 1215-16.

5        California law holds that "when there is no dispute regarding the policy terms or their meaning,

6   but instead the dispute concerns an agent actively misleading an applicant/insured as to the effect of the

7   policy terms, then the holding of cases like <u>Hadland</u> do not apply." <u>Id.</u>, 1717; citing <u>Paper Savers, Inc.</u>

8   <u>v. Nasca</u>, 51 Cal. App. 4th 1090, 1102 (1996). "When the representations are not inconsistent with the

9   terms of an insurance policy, reliance on the misrepresentations may still be 'justifiable.'" <u>Id.</u> This

10  Court held that even assuming plaintiffs had constructive knowledge of the policy terms, Nationwide

11  had not shown the Court a clear policy provision that was contrary to Pena's misrepresentations. <u>Id.</u>,

12  1217. This Court found that although Melvin's belief about the stock market was naïve, it was simply

13  one piece of evidence for the jury to consider. <u>Id.</u>, 1218. Furthermore, justifiable reliance is normally a

14  question of fact for the jury, and Nationwide had not shown it was one of the 'rare cases' in which

15  reasonable minds could come to only one conclusion. <u>Id.</u>

16       This Court noted that Pena was clearly acting as plaintiffs' agent but was nonetheless also

17  acting as 'soliciting agent' for Nationwide. <u>Id.</u>, 1219-20. Pena was authorized to act on behalf of

18  Nationwide as its licensee and was therefore deemed Nationwide's agent as a matter of law. <u>Id.</u>, 1219.

19  Nationwide was also responsible for Pena's conduct because it placed him in a position to commit

20  fraud. <u>Id.</u> Generally speaking, soliciting agents have the authority to do those acts on behalf of the

21  insurer which naturally arise from their soliciting activities, including an explanation of products and

22  terms during the negotiation process. <u>Id.</u>, 1221. Thus, although Pena could not make a binding

23  contract or bind Nationwide to any terms, he could fraudulently induce purchase of a policy through his

24  solicitation activities. <u>Id.</u>, 1221-22.

25       While Defendants argue that there were policy provisions contrary to Plaintiffs' understanding

26  of coverage, Defendants are not taking into account the broad "Livestock Operations" endorsement.

27  Stewart's representations regarding coverage are not inconsistent with the policy language if the trier of

28  fact adopts Plaintiffs' understanding of that endorsement. Accordingly, the question of whether or not

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1  Plaintiffs read the Policies in detail would have no effect on the understanding engendered by Stewart.

2  Certainly, Plaintiffs would not reasonably have purchased a policy for their personal and *business*

3  needs, naming J&T Cattle Co. as an insured, while otherwise agreeing to exclude nearly all their

4  business operations from coverage.

5       In addition, Stewart could be deemed a soliciting agent here because he was apparently

6  authorized by Nationwide to solicit and sell insurance on its behalf and was responsible for explaining

7  the product and terms of the Policies to Plaintiffs.  Indeed, Defendants provided a declaration from

8  Stewart *on their behalf* as well as from their adjuster, David Davis, wherein Stewart appears to be

9  acting for Nationwide, not Plaintiffs.  At the very least, the facts presented by Plaintiffs raise a triable

10  issue of material fact whether Stewart's representations can be attributed to Nationwide.

11     **5.**      **Plaintiffs Are Excused From Reading the Policies Under California
Law, Because They Relied Upon The Representations of Stewart as Their
12        Trusted Insurance Agent and Broker**

13       The California Supreme Court has reiterated the following well-settled principle:

14         For nearly a hundred years we have recognized that "'the rule [presuming parties
are familiar with contract terms] should not be strictly applied to insurance
15         policies. It is a matter of almost common knowledge that a very small percentage
of policy-holders are actually cognizant of the provisions of their policies . . ..
16         The insured usually confides implicitly in the agent securing the insurance, and it
is only just and equitable that the company should be required to call specifically
17         to the attention of the policy-holder such provisions as the one before us.'"

18  See Hayne, 32 Cal. 4th at 1210-11; see also, Eddy, 199 Cal. App. 3d at 864; see also Clement v. Smith,

19  16 Cal. App. 4th 39, 46 (1993); Butcher v. Truck Ins. Exchange, 77 Cal. App. 4th 1442, 1462 (2000).

20       In Butcher, the appellate court was unpersuaded by defendants' argument that a simple

21  comparison of the policies at issue would have revealed to the insured the absence of the coverage

22  requested.  See Butcher, 77 Cal. App. 4th at1463.  Instead, courts look to what "the reasonable

23  expectations of the insured" would be, i.e., whether the insured reasonably expected to be completely

24  covered in the event of loss, "regardless of policy limits." Id., at 1462.

25       Furthermore, as discussed in greater detail above, the terms of any endorsements supercede any

26  exclusionary clauses in the policy.  Haynes, 32 Cal. 4th at 1208; Continental Casualty Co., 46 Cal. 3d at

27  431; Fageol Truck & Coach Co., 18 Cal. 2d at 738.

28  / / /

*Damrell Nelson
Schrimp Pallios
Pacher & Silva
A Professional
Corporation*

23

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1   Accordingly, Defendants' contention that where the policy language is clear, any alleged

2   comment by an agent is irrelevant, ignores the large body of case law in California to the effect that

3   insureds are entitled to rely on the representations of their agents, even when the policy language may

4   appear clear on its face. See Eddy v. Sharp, 199 Cal. App. 3d 858, 864 (1988). Indeed, this Court

5   agreed in Dias, even though (as here), the policy provides bolded notices and warnings to the insured to

6   "READ" and "EXAMINE" the policy.

7   **D.   DEFENDANTS VIOLATED THEIR DUTY TO DEFEND PLAINTIFFS IN THE
8          KAMANGAR CLAIM**

9   Defendants also have a broad duty to defend Plaintiffs under California law where a third party

10  claim may *potentially* be covered, even where indemnity would ultimately be denied (see Gray v.

11  Zurich Ins. Co., 65 Cal. 2d 263, 270, 275 (1966)), and where the policy is ambiguous and the insured

12  would reasonably expect the insurer to defend based on the nature and kind of risk covered by the

13  policy. See Foster-Gardner, Inc. v. National Union Fire Ins. Co., 18 Cal. 4th 857, 869 (1998).

14  A liability insurer owes a broad duty to defend its insured against a claim that "***potentially*** seeks

15  damages within the coverage of the insurance policy." Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th

16  1076, 1081 (1993); see also, Gray, 65 Cal. 2d at 275 (emphasis added). Implicit in this rule is the

17  principle that a duty may exist "even where coverage is in doubt and ultimately does not develop."

18  Montrose Chemical Corp. of Cal. v. Superior Court, 6 Cal. 4th 287, 295 (1993); see also, McGranahan

19  v. Insurance Corp. of NY, 544 F. Supp. 2d 1052, 1057 (2008). "Gray rejected the argument that an

20  insurer had a duty to defend under the policy only if the insured was entitled to indemnity, and held that

21  the duty to defend was independent of and broader than the duty to indemnity." Frontier Oil Corp., 153

22  Cal. App. 4th at 1464; citing Gray, 65 Cal. 2d at 274-75. "Gray stated that uncertainties concerning

23  policy interpretation must be resolved in favor of the **reasonable expectations of the insured**, and that

24  **in light of the policy language, the insured reasonably would expect** the insurer to defend a suit

25  involving a loss of the nature and kinds covered by the policy." Id., (emphasis added); citing Gray, 65

26  Cal. 2d at 274-75. In addition, the insurer "has a duty to defend when the policy is ambiguous and the

27  insured would reasonably expect the insurer to defend ... against the suit based on the nature and kind

28  of risk covered by the policy." Foster-Gardner, Inc., 18 Cal. 4th at 869; citing, Gray, 65 Cal. 2d at 270.

*Damrell Nelson
Schrimp Pallios
Pacher & Silva*
*A Professional
Corporation*

24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   Plaintiffs here reasonably expected that Defendants would not only pay for the loss of the

2   cattle in Plaintiffs' operation, but would also defend and indemnify Plaintiffs from the third party

3   claims relating to the same. Stewart specifically advised Plaintiffs to purchase the subject Policies

4   *because* they would cover losses relating to poisonous feed. Moreover, the broadly worded "Livestock

5   Operations" Endorsement would support Plaintiffs' objectively reasonable expectations as discussed

6   above. Plaintiffs, and any reasonable person, would interpret "livestock operations" to apply to J&T

7   Cattle Company operations. The term is not defined and Plaintiffs are entitled to give it its ordinary

8   and plain meaning. These expectations created the *potential* for coverage under California law.

9   **E.   PLAINTIFFS' BAD FAITH AND PUNITIVE DAMAGES CLAIMS
        CANNOT BE SUMMARILY DENIED WHEN TRIABLE ISSUES OF FACT
10       EXIST REGARDING COVERAGE AND THE REASONABLENESS OF
         DEFENDANTS' DENIALS**

11

12   There has been no discovery in this case and granting a motion for summary judgment based on

13   the assertions of Stewart without Plaintiffs having the opportunity to depose him would be improper.

14   Regardless, material facts are being contradicted by the parties herein, and courts are not permitted to

15   weigh the credibility of the evidence at the summary judgment stage and must accept the non-moving

16   party's version of the facts. Dairy America, Inc. v. New York Marine and General Ins. Co., 2010 WL

17   2102716, 6 (E.D. Cal. 2010). Lastly, the existence of these material facts as to Plaintiffs' coverage and

18   breach of contract claims will also preclude summary judgment on the issue of Defendants' bad faith.

19   See Harbison v. Am. Motorists Ins. Co., 636 F. Supp. 2d 1030, 1040-41 (E.D. Cal. 2009).

20   "The implied covenant of good faith and fair dealing is breached when an insurer delays or

21   denies payment of policy benefits unreasonably or without proper cause (Citations)." Harbison, 636 F.

22   Supp. 2d at 1040-41. "The 'key to a bad faith claim is whether or not the insurer's denial of coverage

23   was reasonable,'" and "'[the] reasonableness of an insurer's claim-handling conduct is ordinarily a

24   question of fact.'" Id.; citing, Hangarter v. Provident Life & Accident Ins. Co., 373 F. 3d 998, 1009-10

25   (9th Cir. 2004). The court's finding that triable issues exist regarding whether coverage applies under

26   the subject policy will preclude summary judgment on the issue of the insurer's bad faith. See Sully-

27   Jones Contractors, Inc. v. American Safety, 2010 WL 1839114, 5 (S.D.Cal. 2010). "Likewise, the

28   / / /

1   Court cannot determine whether, as a matter of law, [the insurer] is protected by the genuine dispute

2   doctrine." *Id.*, citing, <u>Harbison</u>, 636 F. Supp. 2d at 1040-41.

3     The genuine dispute rule in the context of bad faith claims allows a trial court to grant summary

4   judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was

5   reasonable. <u>Harbison</u>, 636 F. Supp. 2d at 1040; citing, <u>Wilson v. 21st Century Ins.</u>, 42 Cal. 4th 713,

6   724 (2007). This Court further summarized the rule in the context of summary judgment motions as

7   follows: "'an insurer is entitled to summary judgment based on a genuine dispute over coverage or the

8   value of the insured's claim only where the summary judgment record demonstrates the absence of

9   triable issues ... as to whether the disputed position upon which the insurer denied the claim was

10  reached reasonably and in good faith.'" <u>Id.</u>, citing <u>Wilson</u>, 42 Cal. 4th at 724.

11    In <u>Harbison</u>, 636 F. Supp. 2d at 1040, this Court was not convinced the genuine dispute

12  doctrine "should ever properly apply where there is dispute as to coverage, legal or factual." "This is

13  because where there is the potential for coverage, an insurer's duty to defend is triggered." <u>Id.</u>; citing,

14  <u>Montrose</u>, 6 Cal. 4th at 299-300. This Court reasoned that "[b]ecause the existence of a genuine

15  dispute as to the insurer's liability indicates that there is at least a potential for coverage, the existence

16  of a genuine dispute is itself enough to trigger the insurer's duty to defend." <u>Id.</u> "Accordingly, this

17  court finds that the genuine dispute doctrine appears wholly incompatible with duty to defend cases."

18  <u>Id.</u>

19    Similarly, where triable issues of fact exist as to whether coverage applies under the

20  subject policies and, thus, whether the insurer acted with bad faith in denying coverage thereunder,

21  triable issues of fact also exist as to whether Defendants acted with malice, oppression or fraud. <u>See</u>

22  <u>Sully-Jones Contractors, Inc.</u>, 2010 WL 1839114 at 5.

23    As discussed above, triable issues of fact exist here regarding whether the cattle losses

24  were covered under the Policies. Where such issues exist, summary judgment on the bad faith and

25  punitive damage claims are inappropriate. Defendants' October 3, 2008 letter, just 24 hours after

26  receiving notice of Plaintiffs' claim, in itself, casts suspicion over Defendants' conduct. Defendants

27  knew that, at that time, Plaintiffs were uncertain about the cause of death. They also knew Plaintiffs

28  were scrambling to find a cause of death so that they could apply a cure and stop the catastrophic

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1   meltdown.  Nevertheless, having conducted no investigation, Defendants shot off a purported denial

2   letter, with an arbitrarily chosen premature "date of loss" so that they could take advantages of

3   Plaintiffs' vulnerable state and trigger the running of the statute of limitations.  Therefore, Plaintiffs

4   urge the Court not to preclude their ability to pursue their bad faith claims against Defendants before

5   there has been meaningful discovery into Defendants' questionable conduct.

6                                          **IV.**

7                                    **CONCLUSION**

8        Based upon the foregoing, Plaintiffs respectfully request that this Court deny Defendants'

9   Motion for Summary Judgment or in the Alternative, Summary Adjudication.

10  DATED:   January 7, 2011                    DAMRELL, NELSON, SCHRIMP,
                                                PALLIOS, PACHER & SILVA
11

12                                           By:___/s/ George P. Rodarakis_____
                                                George P. Rodarakis
13                                              Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Damrell Nelson*
*Schrimp Pallios*
*Pacher & Silva*
*A Professional*
*Corporation*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**