1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT FOR THE

6                  EASTERN DISTRICT OF CALIFORNIA

7
8   TED GAYLORD and SHERI          )     1:10-CV-620  AWI MJS
    GAYLORD, as individuals and dba J&T )
9   CATTLE COMPANY,                )
                                    )
10               Plaintiffs,        )     ORDER ON DEFENDANTS'
          v.                        )     MOTION FOR SUMMARY
11                                  )     JUDGMENT
    NATIONWIDE MUTUAL INSURANCE )
12  COMPANY, an Ohio corporation,   )
    AMCO INSURANCE COMPANY, an  )
13  Iowa corporation, ALLIED GROUP, INC)
     an Iowa Corporation, and DOES 1  )
14  through 100,                    )
                                    )
15               Defendants.        )
    _____)

16
17
18          This is an insurance coverage case that arises out of the death of cattle.  Plaintiffs Ted and

19  Sheri Gaylord ("Plaintiffs") brought suit against Defendants Nationwide Mutual Insurance

20  Company ("Nationwide") and Amco Insurance Company ("Amco") (collectively "Defendants")

21  because Defendants refused to cover the loss and defend Plaintiffs against the claims of a third

22  party.  Plaintiffs allege claims for breach of contract, breach of the covenant of good faith and

23  fair dealing, and declaratory relief.  Defendants now move for summary judgment on all claims.

24  For the reasons that follow, Defendants' motion will be granted in part, and denied in part.

25
26                            FACTUAL BACKGROUND

27          Plaintiffs own and operate a livestock operation known as J&T Cattle Co., whereby they

28  raise beef cattle owned by them as well as beef cattle owned by others.  PUMF 1; see also DUMF

4.  Plaintiffs' livestock operation is principally located at 27552 Lake Road, La Grange, California.  PUMF 2.[1]  Individuals bring cattle to Plaintiffs' farm, where their cattle is fed and cared for by Plaintiffs until the cattle reach a certain weight and are ready for slaughter.  JUMF 21.

Nationwide issued a farm-owners insurance policy ("the Farm Policy") to Plaintiffs on March 26, 2008.  JUMF 1.  Plaintiffs' livestock operation at 27552 Lake Road is listed as an insured location, and J&T Cattle Company is listed as an additional insured.  PUMF 4, 5.  The Farm Policy states in part, "You should read your policy and review your declarations page for complete information on the coverages you are provided."  JUMF 2.  Similarly, Coverage E of the Farm Policy reads in part, "Various provisions of this policy restrict coverage.  Read the entire policy carefully to determine rights, duties, and what is and is not covered."  JUMF 3.

The Farm Policy also includes two "Farm Property Schedules," but neither schedule lists "livestock."  JUMF 5, 6.  The term "farm personal property" is defined to include "livestock," and "livestock" is defined to include "cattle."  See JUMF 7; Davis Dec. Ex. A at p. 60.  Coverage E of the Farm Policy states that Nationwide "will pay for direct physical loss of or damage to Covered Property at the 'insured location' described in the Declarations . . . caused by or resulting from any COVERED CAUSES OF LOSS."  PUMF 6.  Coverage E also states in part, "All of the following are Covered Property under Coverage E of this Coverage Form, provided a limit of insurance is shown in the Declarations for the specific type of property . . . (b) 'livestock,' 'poultry,' and other animals covered against BROAD Covered Causes of Loss . . . ."  JUMF 4.  Coverage E defines "Broad" covered causes of loss as:

> BASIC plus the following: m. breakage of glass or safety glazing material, n. falling objects, o. weight of ice, snow or sleet, p. sudden and accidental tearing apart, q. accidental discharge or leakage of water or steam, r. freezing, s. sudden and accidental damage from electrical current, t. electrocution of covered

---

[1]Defendants object to this PUMF as lacking personal knowledge.  The PUMF is supported by declarations from Plaintiffs.  It is well established that personal knowledge may be inferred from an affidavit based on the nature and position of the affiant's participation in the matters to which he swore.  Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990); see In re Kaypro, 218 F.3d 1070, 1075 (9th Cir. 2000).  The declarations state that Plaintiffs own and operate a livestock operation, and then state the operation's location.  See Ted Gaylord Dec. ¶ 3; Sheri Gaylord Dec. ¶ 3.  As the owners and operators of that cattle operation, Plaintiffs  would know the operation's principal location.  Barthelemy, 897 F.2d at 1018.  Defendant's objection is frivolous.

livestock, u. attacks on covered livestock by dogs or wild animals, v. accidental shooting of covered livestock, w. drowning of covered livestock from external causes, x. loading/unloading accidents, y. collision causing death of covered livestock, z. earthquake loss to livestock, aa. flood loss to livestock.[2] JUMF 9.

Coverage E's "Loss Settlement Conditions" page for "Scheduled Farm Personal Property" states in pertinent part: "d.  Livestock, Poultry, Bees, Fish, Worms, and Other Animals . . . With respect to 'livestock,' . . . the term loss means death or destruction caused by, resulting from, or made necessary by a covered cause of loss."  JUMF 10.

The Farm Policy contains a "Form Liability Coverage Form" for claims made by third parties against the insureds, which is Coverage H.  See JUMF 12.  Like Coverage E, Coverage H states in part, "Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties, and what is or is not covered."  Id.  Under the "Insuring Agreement," Coverage H states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."  JUMF 13.  Coverage H's "Exclusions" provide in part: "**b. Contractual Liability** . . . 'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. . . . **q. Custom Farming, Custom Feeding, and Farm Management** . . . 2) 'Custom feeding' of 'livestock' by an insured unless specifically endorsed . . . ."  Id.  Coverage H defined "property damage" to include loss of use or physical injury to tangible property.  JUMF 15.  Coverage H defined "Custom Feeding" to mean "the raising or feeding of 'livestock' for others on an 'insured location.'"  Id.  Coverage H also excluded "'property damage' that arises out of or is a result of any breach of a written or oral contract, any breach of any other written or oral agreement, or any breach of an express or implied warranty."  JUMF 14.

---

[2] "BASIC" covered causes of loss were defined as: a. fire or lightening, b. windstorm or hail, c. explosion, d. riot or civil unrest, e. aircraft, f. vehicles, g. smoke, h. vandalism, i. theft, j. sinkhole collapse, k. volcanic action, l. collision causing damage to covered farm personal property.  JUMF 8.

The Farm Policy does not contain a "custom care and feeding" endorsement.  DUMF 3.
However, as part of Coverage H, there is a broad endorsement entitled "Livestock Operations
Coverage Endorsement."  PUMF 8.  That endorsement states that it "modifies the insurance
provided" under the "Farm Liability Coverage Form," and continues: "In consideration of the
premium charged for this endorsement, the liability coverage of this policy applies to your
livestock operations. **All terms and conditions of this policy apply unless modified by this
endorsement.**"  Farm Policy at p. 94 (emphasis in original).

The Farm Policy has a clause regarding legal actions that states: "**Legal Action Against
Us** . . . No one may bring a legal action against us under this form unless . . . b. The action is
brought within 1 year after the date on which the direct physical loss or damage occurred."
JUMF 11 (emphasis in policy).

Also on March 26, 2008, AMCO issued a farm umbrella policy ("the Umbrella Policy")
to Plaintiffs.  JUMF 16.  The Umbrella Policy in part provides that it will not apply if the
"underlying insurance" does not cover the "loss" for reasons other than exhaustion of an
aggregate limit of insurance.  See JUMF 17.  The Umbrella Policy also adopts the exclusions of
the "underlying insurance" as follows:  "The exclusions applicable to the 'underlying insurance'
also apply to this insurance."  See JUMF 18.  Like the Farm Policy, the Umbrella Policy includes
an exclusion for "Contractual Liability" and "Custom Feeding of Livestock."  See JUMF 19.
"Custom Feeding" is defined as "the raising or feeding of livestock for others on an 'insured
location' on an underlying policy."  Id.

When Plaintiffs purchased the policies, they believed Brian Stewart ("Stewart") was their
broker.  PUMF 9.  Stewart is identified as the agent on the subject policies.  PUMF 10.  Plaintiffs
had a long-standing professional relationship with Stewart, who handled all of Plaintiffs'
personal and business insurance needs since about 1998, and Stewart's father before him since
about 1996.  PUMF 11.  Plaintiffs considered Stewart to be in a position of trust and confidence
with them.  PUMF 12.  Stewart was very familiar with Plaintiffs' personal and business needs,
having procured insurance for all of Plaintiffs' needs from medical and tenant insurance to the
comprehensive farm-owner's package at issue in this case.  PUMF 13.  Plaintiffs relied entirely

1   on Stewart to provide adequate and agreed upon coverage for Plaintiffs.  PUMF 14.  Plaintiffs

2   relied entirely on Stewart to inform them of any contrary provisions in the policies.  PUMF 15.

3   Plaintiffs believed Stewart was responsible for explaining the policies to Plaintiffs.  See PUMF

4   16.  From March 1996 to March 2007, Plaintiffs purchased their farm policies from Fireman's

5   Fund, which was selected and procured by Stewart and his father before him.  PUMF 17.

6          During the 2006 heat wave, Plaintiffs suffered loss when they had to reimburse a client

7   for the heat-related deaths of about 147 cattle at Plaintiffs' livestock operation.  PUMF 18.

8   Stewart informed Plaintiffs that their then existing insurance policy did not provide coverage for

9   losses resulting from acts of God, like the heat wave.  See PUMF 19.

10         When Stewart sought to renew Plaintiffs' policies in March 2007, he advised Plaintiffs to

11  switch to the Nationwide policy because it provided better coverage for Plaintiffs' operation.

12  PUMF 20.  Plaintiffs expressed to Stewart their concerns about losses related to contaminated

13  feed, since a local dairy suffered substantial loss after feeding cattle hay tainted with botulism.

14  See PUMF 21.  Plaintiffs discussed with Stewart that if such an event occurred on their livestock

15  operation, they would not be able to sustain the losses, and therefore needed adequate coverage.

16  See PUMF 22.  Plaintiffs understood, based on Stewart's representations to that effect, that

17  Stewart was researching the most suitable policy for Plaintiffs based on their needs and concerns.

18  PUMF 23.  Stewart specifically advised Plaintiffs to switch to Nationwide because, according to

19  Stewart, Nationwide's Farm Policy would cover the damage to cattle excluded under the

20  Fireman's Fund, including damage from consumption of poisonous or contaminated feed.[3]

21  PUMF 24.[4]  Based on Stewart's representations, and because they trusted him, Plaintiffs

22

23         [3]There is a material dispute as to Stewart's statements to Plaintiff.  As discussed *infra*, Stewart declares that
    he told Plaintiffs that a special endorsement was needed for loss related to "custom feeding of livestock," but that

24  Plaintiffs refused the endorsement.  See  DUMF's 1, 2.  This is contrary to Plaintiffs' declarations.  For purposes of
    this motion, the Court must credit Plaintiffs' version of events.  See Stegall v. Citadel Broad., Inc., 350 F.3d 1061,

25  1065 (9th Cir. 2003).

26         [4]Defendants object to Paragraph 9 of Ted Gaylord's declaration, which is the basis of this PUMF.  The
    objection reads, "Hearsay; inadmissible parole evidence."  The objections are not well taken.  What Stewart told

27  Gaylord at least goes to establish knowledge or belief on the part of Gaylord, which is a not hearsay.  See Kunz v.
    Utah Power & Light Co., 913 F.2d 599, 605 (9th Cir. 1990); Entous v. Viacom Int'l, Inc., 151 F.Supp.2d 1150, 1157

28  n.5 (C.D. Cal. 2001).  As for "inadmissible parole evidence," Defendants cite to no rule of evidence and do not
    otherwise explain their objection.  To the extent that Defendants rely on California's parole evidence rule, it is well

1   purchased the policies selected by Stewart.  PUMF 25.

2       Stewart did not disclose or explain to Plaintiffs the meaning or existence of the terms

3   "custom care and feeding" in the Policies or that the Policies contained a "custom care and

4   feeding" exclusion, and neither did Defendants.  PUMF 26.  Nor did Stewart or Defendants

5   inform Plaintiffs that there was a specific exclusion in the Policies for losses resulting from

6   Plaintiffs' "business pursuits" or for harm assumed by Plaintiffs pursuant to a contract.  PUMF

7   27.  Nor did anyone, including Stewart, advise Plaintiffs of any "custom care and feeding

8   coverage endorsement."  PUMF 28.  The only additional coverage that Stewart mentioned to

9   Plaintiffs prior their purchase of the Policies was a catchall-type endorsement that Stewart said

10  would cover every other eventuality no typically covered, but that such a policy was expensive

11  ($5,000 to $6,000 per month), more typical for mid-western states, and was not something

12  Plaintiffs really needed.  PUMF 29.

13      Parvis Kamangar was a client of Plaintiffs.  JUMF 22.  Between March 18, 2008, and

14  May 8, 2008, Plaintiffs and Kamangar purchased 1,154 Holstein steer calves, with an average

15  weight of 290 lbs. per head.  See DUMF 5; PUMF 30.  The cattle were branded with Kamangar's

16  cattle brand.  DUMF 6.  The 1,154 head of cattle were transported to Plaintiffs' livestock

17  operation on the insured premises for care and feeding.  See DUMF 7; PUMF 31.  Kamangar

18  paid Plaintiffs "for care and feeding" of the cattle.  DUMF 8.

19      Around June 2008, some of the cattle began dying suddenly, and cattle were dying at

20  alarming rates by September and October 2008.  PUMF 32.  When the cattle initially started

21  dying, the death rates were still not above the normal rates for Plaintiffs' operation for the time of

22  year.  PUMF 35.  Around July 2008, cattle that Plaintiffs were raising for Kamangar at Plaintiffs'

23  feed yard became ill, and many of the cattle died.  JUMF 23.  Plaintiffs believe the death and

24  illness of the cattle was the result of feed that was purchased locally and fed to the cattle in May

25  2008.  JUMF 24.  Plaintiffs immediately began trying to save any potentially infected animals

26  ─────────────────

27  settled that the parole evidence rule does not apply when evidence is submitted to explain the meaning of an
    ambiguous term/contract.  Casa Herrera, Inc. v. Beydoun, 32 Cal.4th 336, 343 (2004).  As discussed below, the

28  "Livestock Operations Endorsement" creates an ambiguity in the Farm Policy.  Defendants' objections are overruled.

1  while investigating the cause of the harm.  PUMF 34.  Plaintiffs immediately sought medical

2  attention for the sick and dying animals and had four of carcases evaluated by a veterinarian.

3  PUMF 36.

4      Plaintiffs were actively investigating the cause of their progressive cattle loss and began

5  receiving necropsy reports in September and October 2008 that were performed by the University

6  of Arizona and the University of California at Davis.  PUMF 49.  The necropsies established that

7  the cattle sustained severe damage to their livers, consistent with chronic poisoning by toxic

8  plants containing pyrrolizidine alkaloids ("PA").  PUMF 51.  During the relevant time period,

9  Plaintiffs purchased all of their alfalfa from Associated Feed & Supply Company, a substantial

10  portion of which was traced to the Stokes Ranch.  PUMF 52.  A forensic agronomist, who was

11  retained by Plaintiffs, inspected Stokes Ranch and found large quantities of plants containing PA.

12  PUMF 52, 53.  The agronomist informed Plaintiffs that, once ingested, PA typically results in

13  progressive liver failure, which is consistent with the necropsy report.  PUMF 55.  In October

14  2008, because there is no known remedy for PA poisoning, for mitigation purposes, Plaintiffs

15  obtained clearances from the Department of Agriculture in order to sell the cattle in November

16  2008.  PUMF 56.

17      By November 2008, nearly 2,000 head of cattle had been affected, of which about 320

18  died and 810 were sent to early slaughter at a low butcher price.  PUMF 37.  Three-quarters of the

19  affected animals were contracted for sale at specified prices and were expected to be slaughtered

20  in Spring/Summer 2009 at an average weight of 1,312 lbs.  PUMF 38.  Plaintiffs observed

21  damage to older cattle (weighing 800 to 900 lbs.) in November 2008.  PUMF 39.  Sixteen

22  animals owned by Jason Roth died, and Plaintiffs reimbursed him about $16,000.  PUMF 40.

23  The cattle suffered a continuing and deteriorating type of injury.  PUMF 47.  Plaintiffs' contend

24  that their damages did not become appreciable until they determined there was no way to stop the

25  deaths, forcing them to slaughter a majority of the cattle as calves in November 2008, at below

26  market cost and well below their target weight.  See PUMF 48.  Plaintiffs were still trying to treat

27  and save any infected animals through November 2008.  PUMF 50.

28      On October 2, 2008, Plaintiffs made a claim with Nationwide under the Farm Policy for

1   the loss of cattle under Plaintiffs' care.  JUMF 25; PUMF 41.  Plaintiffs informed Nationwide

2   that they were still investigating the damage and the cause of death, but that they believed that

3   the loss was due to the ingestion of contaminated feed.  PUMF 42, 43.[5]

4        On October 3, 2008, Nationwide sent a letter to Plaintiffs denying the first party property

5   claim on the grounds that injury to cattle is not covered unless the cattle are specifically

6   scheduled in the declarations page.  JUMF 26; Davis Dec. Ex. C.  Nationwide's letter stated that,

7   "if you believe that our understanding of the facts underlying the claim is incorrect, or should you

8   have any additional information that you feel may alter our decision, please advise our office

9   immediately."  PUMF 44.  The letter also informed Plaintiffs that Coverage E contained a one

10  year limit to file a lawsuit challenging the claim determination.  See JUMF 27.  Nationwide

11  specifically informed Plaintiffs that they had until May 21, 2009, in which to file a legal action

12  against Nationwide.  See JUMF 28; PUMF 45.  The May 21, 2008 accrual date used by

13  Nationwide does not correspond to when the cattle began to show signs of injury.  See PUMF 46.

14       Despite denying Plaintiffs' first party claim, Nationwide continued to investigate the third

15  party claim (including the claims of Kamangar and Jason Roth, another owner of cattle cared for

16  by Plaintiffs).  JUMF 30.  On October 30, 2008, Nationwide sent Plaintiffs' attorney a letter

17  requesting:  copies of any contracts between Plaintiffs and Kamangar, verification of location of

18  the feedlot, documents supporting the amount of damages, and contact information for the feed

19  suppliers.  See JUMF 31.  On January 8, 2009, Nationwide sent a follow-up letter to Plaintiffs'

20  attorney advising that Nationwide had not received a response to its previous request for

21  information.  See JUMF 32.

22       In addition to the two letters identified above, Nationwide left telephone messages with

23  Plaintiffs' counsel on October 15, October 16, October 28, November 14, and December 2, 2008,

24  seeking the same information as the two letters.  See DUMF 9-14.  It does not appear that

25  Plaintiffs' counsel responded to these telephone message.  See id.  In 2009, Nationwide again

26

27

28       [5]Defendants object to this PUMF's as based on hearsay.  However, the Court considers these PUMF's, not
    for the truth of the matter asserted, but to show knowledge or belief.  See Kunz, 913 F.2d at 605.  Further, even if the
    Court did not consider these PUMF's, the result of the motion would not change.

attempted to obtain information and left telephone messages with Plaintiffs' counsel on January 21, February 5, and February 20.  See DUMF 15-17.

On March 25, Stewart left a voice-mail with Nationwide that requested Nationwide forward to him any correspondences that Nationwide had sent to Plaintiffs' counsel in order to assist Nationwide in gathering information.  See DUMF 18.  Nationwide e-mailed the correspondences to Stewart.  See DUMF 19.

On April 1, 2009, Plaintiffs filed suit against Associated Feed & Supply and Stokes Ranch.  PUMF 57.

On April 6 and 7, 2009, Nationwide left voice-mail messages for Plaintiffs' counsel. See DUMF 20, 21.

On April 9, 2009, Plaintiffs' attorney told Nationwide that Plaintiffs were in the process of suing the supplier and grower of the feed that caused injury to the cattle.  JUMF 33.

On April 13, 2009, Nationwide conducted a telephone interview of Ted Gaylord and obtained a recorded statement (Gaylord's attorney was present).  See JUMF 34.

Between October 2, 2008, and April 13, 2009, Plaintiffs were compiling information in preparation for their lawsuit against the feed suppliers, which included not only examination of the dead and dying animals, but also investigation, tracing, and sampling (among other things) of the feed.  PUMF 58.  Promptly upon completion of the investigation and the filing of the lawsuit against the feed suppliers, Ted Gaylord submitted to the recorded telephone interview on April 13, 2009.  See PUMF 59.  Plaintiffs were engaged in extensive fact-gathering up to and including April 2009 and beyond.  See id.

On April 29, 2009, Nationwide sent a correspondence to Plaintiffs that denied Kamangar's liability claim on the grounds that the injury to the cattle was excluded from coverage under both the Farm Policy and the Umbrella Policy.  JUMF 35.  The letter included a statement that Defendants "will reconsider its coverage position based on the allegations of the suit and any additional and/or different information provided to [Defendants] at that time."  PUMF 60.

On September 11, 2009, Kamangar filed a lawsuit against Plaintiffs in state court.  See

1  JUMF 36.

2       On October 29, 2009, Plaintiffs made a tender of defense and request for indemnity to

3  Defendants regarding Kamangar's lawsuit.  See DUMF 22.

4       On November 6, 2009, Nationwide acknowledged receipt of Plaintiff's request and

5  mailed a letter to Plaintiffs' counsel.  DUMF 23.  The same day, Defendants asked an attorney to

6  review the Farm Policy and the Umbrella Policy in order to determine whether there was

7  coverage.  See DUMF 24.

8       On January 12, 2010, an attorney for Defendants sent Plaintiffs' counsel a twenty-two

9  page letter advising that Plaintiffs' tender of defense and indemnity for the Kamangar claim was

10  not covered under the policies.  JUMF 37.

11       On March 4, 2010, Plaintiffs filed this lawsuit.  JUMF 29.

12

13                    **SUMMARY JUDGMENT FRAMEWORK**

14       Summary judgment is appropriate when it is demonstrated that there exists no genuine

15  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

16  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

17  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

18  judgment bears the initial burden of informing the court of the basis for its motion and of

19  identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

20  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

21  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

22  might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

23  Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

24  Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

25  sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson,

26  477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

27       Where the moving party will have the burden of proof on an issue at trial, the movant

28  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire, 210 F.3d at 1102-03. If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

circumstances to consider materials that are not properly brought to its attention, but the court is

not required to examine the entire file for evidence establishing a genuine issue of material fact

where the evidence is not set forth in the opposing papers with adequate references.  See

Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

to produce evidence sufficient to create a genuine issue of material fact, the moving party is

entitled to summary judgment.  See Nissan Fire, 210 F.3d at 1103.


**DEFENDANTS' MOTION**

1.      Coverage Under The Farm & Umbrella Policies

*Defendants' Argument*

With respect to the first party claim under Coverage E only, Defendants argue that the

Farm Policy has a one year limitation period in which Plaintiff could sue to enforce the policy.

Plaintiff realized that they had a claim beginning in May 2008.  Plaintiff made a claim with

Nationwide, Nationwide investigated, and denied the claim.  By the terms of the Policy, Plaintiff

had until May 2009 in which to bring a suit, and Nationwide expressly informed Plaintiff in

October 2008 of the one year limitation and the May 2009 deadline.  Further, any claim of

equitable tolling has no merit.  At the latest, any such tolling would have ended on October 3,

2008, when Nationwide sent the letter to Plaintiff that unequivocally denied the first party claim.

Once there is an unequivocal denial, there is no longer any basis for tolling.

Gaylord is presumed to have read the Policy, and he did not object to the Farm Policy

once he received it.  Under such circumstances, an insured cannot claim that he did not read a

policy or know its terms, and cannot make a claim that contradicts that clear terms of a policy.

Gaylord's first party property claim and third party liability claim contradict the clear language of

the Farm Policy.  There is no coverage under Coverage E because no cattle were listed by

Gaylord in the declarations.  Also, Coverage E provides coverage for particular enumerated

losses, and injury due to poisoned or contaminated feed is not one of the enumerated losses.

There is no coverage under Coverage H for Kamangar's claims/lawsuit because there are exclusions for the "custom feeding of livestock," which is defined as the raising and feeding of cattle for others, and for damages resulting from contractual liability. There is no dispute that Gaylord was raising and feeding the cattle for Kamangar. As such, there is no indemnity provided by Coverages E and H. Further, because there is no coverage under the Farm Policy, there is no coverage provided by the Umbrella Policy.

*Plaintiffs' Opposition*

Plaintiffs argue that their first party claim is not time barred because they are entitled to equitable tolling. First, Plaintiffs argue that Defendants are using an arbitrary date of May 21, 2008, to begin the limitations period. This date appears to coincide with the date the cattle were fed the contaminated feed, but does not coincide with a date in which Plaintiffs sustained appreciable losses. The limitations period begins to run when a claimant suffers appreciable damage, and when appreciable damage occurs is a question of fact. The damages in this case were continuing and deteriorating, and the majority of Plaintiffs' damages did not occur until November 2008. It is a question for the jury to determine when the statute began to run, but at the earliest, it began on October 3, 2008.

Second, to begin the limitations period, Defendants were required to unequivocally deny Plaintiffs' claim. However, the denial letter, which was sent the very next day after the claim was submitted, was not unequivocal. The letter indicated that Plaintiffs could either make a claim or present further/additional information to be reviewed by May 21, 2009. Plaintiffs presented additional information to Defendants on April 13, 2009, when Ted Gaylord gave a taped interview to Nationwide.

Third, the limitations period was tolled while Defendants investigated the claims. Although the denial letter of April 29, 2009, focused on the third party claim, Plaintiffs believed Defendants were still investigating the first party claims as well, since the two claims were based on the same course of events. The April 29, 2009, letter also referenced Plaintiffs 50% equity interest in the lost cattle. The letter also told Plaintiffs that Nationwide would reconsider the coverage decision based on the allegations of Kamangar's lawsuit and any additional or different

information submitted.

In sum, Plaintiffs contend that the statute was tolled from October 2, 2008, to April 29, 2009, then ran for 6 months, then was tolled again on October 29, 2009 (when Defendants granted Plaintiffs reconsideration and reopened the claim) to the final and unequivocal denial on January 10, 2010. Because Plaintiffs filed suit on March 10, 2010, the suit is timely and there are at least disputed issues of material fact that make summary judgment improper.

With respect to coverage, Plaintiffs argue *inter alia* that there is coverage under the Farm Policy through the "Livestock Operations Endorsement." Plaintiffs contend that the endorsement should be given the meaning that a lay person would ascribe, which would be a cattle operation like Plaintiffs' where cattle are fed and raised for a fee. Under this understanding of a livestock operation, the endorsement would control over the exclusions because it is well settled that special endorsements will govern over general exclusions in a policy. Also, at the time the Farm Policy was purchased, Plaintiffs believed that they were purchasing comprehensive farm insurance that would cover their personal and business needs. It would be anomalous for Plaintiffs to purchase a policy that excluded their business pursuits in feeding and raising livestock.

*Legal Standard*

a.   Limitations Period

It has been held that "a covenant shortening the period of limitations is a valid provision of an insurance contract and cannot be ignored with impunity as long as the limitation is not so unreasonable as to show imposition or undue advantage." Prudential -LMI Com. Ins. v. Superior Court, 51 Cal.3d 674, 683 (1990); C& H Foods Co. v. Hartford Ins. Co., 163 Cal.App.3d 1055, 1064 (1984). One year limitations periods have been found valid, see C&H Foods, 163 Cal.App.3d at 1064, including the one year limitations period authorized by California Insurance Code § 2071 for fire policies. Prudential, 51 Cal.3d at 683. In first party property cases, the limitations period "begins to run on the date of inception of the loss, defined as that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered."

14

Prudential, 51 Cal.3d at 678; Migliore v. Mid-Century Ins. Co., 97 Cal.App.4th 592, 604 (2002).

"The more substantial or unusual the nature of the damage discovered by the insured (e.g., the greater its deviation from what a reasonable person would consider normal wear and tear), the greater the insured's duty to notify his insurer of the loss promptly and diligently." Prudential, 51 Cal.3d at 687; Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange, 132 Cal.App.4th 1076, 1086 (2005). Generally, "[d]etermining when appreciable damage occurs such that a reasonable insured would be on notice of a potentially insured loss is a factual matter for the trier of fact." Prudential, 51 Cal.3d at 687; Doheny, 132 Cal.App.4th at 1086. However, when the evidence supports only one conclusion, summary judgment may be appropriate. See Prudential, 51 Cal.3d at 699; Kapsimallis v. Allstate Ins. Co., 104 Cal.App.4th 667, 673 (2002); Stephens v. Allied Ins. Co., 2006 U.S. Dist. LEXIS 82626, *12-*15 (N.D. Cal. Nov. 13, 2006). The limitations period is tolled from the time the insured gives notice of the claim to the insurance company until the time the insurer formally denies the claim in writing. Prudential, 51 Cal.3d at 687; Ashou v. Liberty Mutual Fire Ins. Co., 138 Cal.App.4th 748, 757 (2006). The insurer's denial must be "unequivocal." Ashou, 138 Cal.App.4th at 758 n.5; Doheny Park, 132 Cal.App.4th at 1088; Migliore, 97 Cal.App.4th at 604; Aliberti v. Allstate Ins. Co., 74 Cal.App.4th 146-47 (1999). Neither an invitation to the insured to provide further information nor a statement of willingness to reconsider a decision upon receipt of further pertinent information will render a denial equivocal. Heighley v. J.C. Penney Life Ins. Co., 257 F.Supp.2d 1241, 1257 (C.D.Cal. 2003); Migliore, 97 Cal.App.4th at 605; Singh v. Allstate Ins. Co., 63 Cal.App.4th 135, 147-48 (1998). An insured's request to an insurer to reconsider a denial will not toll a limitations period, but an insurer's agreement to reopen and reinvestigate can toll the limitations period. See Ashou, 138 Cal.App.4th at 762-63.

      b.    Insurance Contract Interpretation

     "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." Powerine Oil Co., Inc. v. Superior Court, 37 Cal.4th 377, 390 (2005); Bank of the West v. Superior Court , 2 Cal.4th 1254, 1264 (1992). "[The] goal in construing insurance contracts, as with contracts generally, is to give effect to the

parties' mutual intentions." Minkler v. Safeco Ins. Co. of America, 49 Cal.4th 315, 321 (2010); see Powerine, 37 Cal.4th at 390.   The parties mutual intentions are to be inferred, if possible, solely from the written provisions of the contract.  Ameron Internat. Corp. v. Insurance Co. of the State of Penn., 50 Cal. 4th 1370, 1378 (2010); Powerine, 37 Cal.4th at 390.  First, "[i]f contractual language is clear and explicit, it governs."  Minkler, 49 Cal.4th at 321; Powerine, 37 Cal.4th at 390.  "[P]olicy language is interpreted in its ordinary and popular sense and as a layman would read it and not as it might be analyzed by an attorney or an insurance agent." E.M.M.I, Inc. v. Zurich Am. Ins. Co., 32 Cal.4th 465, 471 (2004).  "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable."  Powerine, 37 Cal.4th at 390; see Ameron, 50 Cal.4th at 1378.  Second, "[i]f the terms are ambiguous . . . [courts] interpret them to protect the objectively reasonable expectations of the insured."  Minkler, 49 Cal.4th at 321; Bank of the West, 2 Cal.4th at 1265.  This step has also been expressed as interpreting "the provisions in the way the insurer believed the insured understood them at the time the policy was purchased."  Ameron, 50 Cal.4th at 1378; Safeco Ins. Co. v. Robert S., 26 Cal.4th 758, 762 (2001).  Third, "[i]f an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage."  Powerine, 37 Cal.4th at 391; La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., 9 Cal.4th 27, 37 (1994); see Minkler, 49 Cal.4th at 321.

"To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer."  Minkler, 49 Cal.4th at 322; see MacKinnon v. Truck Ins. Exchange, 31 Cal.4th 635, 648 (2003).  The mere fact that a term is not defined in the policy does not make the term ambiguous.  Powerine, 37 Cal.4th at 390.  Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the

abstract.  Powerine, 37 Cal.4th at 390-91; Bank of the West, 2 Cal.4th at 1265.  "Extrinsic evidence is admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible."  City of Manhattan Beach v. Superior Court, 13 Cal.4th 232, 238 (1996); Parsons v. Bristol Development Co., 62 Cal.2d 861, 866 (1965).

"An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy."  Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th 1436, 1463 (2007); Adams v. Explorer Ins. Co., 107 Cal.App.4th 438, 450–51 (2003).  "[T]he policy of insurance with the endorsements and riders thereon must be construed together as a whole."  Frontier Oil, 153 Cal.App.4th at 1463; Adams, 107 Cal.App.4th at 451.  "An endorsement can expand or restrict the coverage otherwise provided by the policy," and if "there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be conspicuous, plain and clear."  Frontier Oil, 153 Cal.App.4th at 1463; see Haynes v. Farmers Ins. Exchange, 32 Cal.4th 1198, 1208 (2004); see also John Deere Ins. Co. v. Nueva, 229 F.3d 853, 858-859 (9th Cir. 2000); Waller v. Truck Ins. Exchange, Inc., 11 Cal.4th 1, 18 (1995).  That is, "if there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls."  Venoco, Inc. v. Gulf Underwriters Ins. Co., 175 Cal. App. 4th 750, 766 (2009) (quoting Continental Cas. Co. v. Phoenix Constr. Co., 46 Cal.2d 423, 431 (1956)).

Generally, the interpretation of an insurance policy is a question of law.  Ameron, 50 Cal.4th at 1378; Garcia v. Truck Ins. Exchange, 36 Cal.3d 426, 439 (1984).  However, when the interpretation of the contract turns upon the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may be resolved by the jury.  City of Hope National Medical Center v. Genentech, Inc., 43 Cal.4th 375, 395 (2008); Garcia, 36 Cal.3d at 439.

*Discussion*

a.      First Party Property Claim Under Coverage E

There is a problem with the timeliness of Plaintiffs' first party property claims.

As indicated above, the Farm Policy has a one year limitations period to bring suit over a

17

1   coverage decision.   See JUMF 11.  Also as discussed above, that one year limitations period

2   began to run when the damage became sufficiently "appreciable" to Plaintiffs that they would

3   know to contact Nationwide.[6]  See Prudential, 51 Cal.3d at 683.  Plaintiffs contend that the

4   damage was not sufficiently appreciable until November 2008 when the surviving cattle were

5   sent to slaughter, but Defendants contend that the loss occurred on May 21, 2008, when the cattle

6   ingested the contaminated feed.  See Court's Docket Doc. No. 20 at 15:21-23; PUMF 48.  The

7   Court finds both dates improper.

8          With respect to the May 21, 2008, date, the uncontradicted evidence is that the cattle were

9   not dying in any unusual or abnormal numbers until September/October 2008.  See PUMF 32.  It

10  is uncontradicted that when the cattle started to suddenly die in June 2008, the death rates were

11  not above the normal death rates for that time of year.  See PUMF 35.  In the process of raising

12  cattle, it is to be expected that some cows simply die due to "natural causes."  Cf. id.  Plaintiffs

13  could not have been expected to know that there was a problem until the cattle began to die in

14  abnormal or "alarming" numbers.  The damage to the cattle was not appreciable in May 2008.

15  See Prudential, 51 Cal.3d at 687; PUMF's 32, 35.

16         With respect to the November 2008 date urged by Plaintiffs, that date focuses on when

17  the damages/loss became the most acute.  By Plaintiffs' own admission, November 2008 is when

18  Plaintiffs sent to early slaughter over 800 head of infected cattle.  See PUMF 37.  However, the

19  standard is when the damage became "appreciable," the standard is not when the full extent of

20  the damage became known.  See Campanelli v. Allstate Life Ins. Co., 322 F.3d 1086, 1094 (9th

21  Cir. 2003); Hill v. Allstate Ins. Co., 962 F.Supp. 1244, 1248 (C.D. Cal. 1997); Doheny Park, 132

22  Cal.App.4th at 1086; Magnolia Square Homeowners Assn v. Safeco Ins. Co., 221 Cal.App.3d

23  1049, 1059-60 (1990).  There is no doubt that Plaintiffs were aware that the cattle were infected

24  or suffering from some terminal condition before November 2008.  See PUMF 32.  Damage was

25  appreciable, that is, Plaintiffs knew that the significantly abnormal loss was occurring, prior to

26

27         [6]The Farm Policy does not use the phrase "inception of the loss;" it uses the phrase the date the "loss or
damage occurred."  This difference is inconsequential.  Magnolia Square Homeowners Ass'n v. Safeco Ins. Co., 221
28  Cal. App. 3d 1049, 1059 n.3 (1990); State Farm Fire & Casualty Co. v. Superior Court, 210 Cal. App. 3d 604, 610
(1989); cf. Stephens v. Allied Ins. Co., 2006 U.S. Dist. LEXIS 82626, *12-*13 (N.D. Cal. Nov. 13, 2006).

the deaths of 320 head of cattle and the early slaughter of over 810 head in November 2008.

It is clear that Plaintiffs knew that there was a problem with the cattle prior to November 2008, because Plaintiffs admit that the cattle started dying in "alarming rates" in September and October 2008.  PUMF 32.  Plaintiffs contacted veterinarians and investigated and tried to save the cattle.  See PUMF's 36, 49.  When Plaintiffs believed that the cattle had consumed poison feed, they contacted Nationwide and told them about the deaths and about their suspicion that the cause of death was tainted feed.  See PUMF's 41,42.  The point at which it became apparent that cattle were dying in abnormal or "alarming" numbers is the point in time in which Plaintiffs' loss became appreciable because that is the time when the typical course of events became so unusual.  See Prudential, 51 Cal.3d at 687; PUMF's 32, 35.  Sometime in September or October 2008, which happens to coincide with the date that Plaintiffs contacted Nationwide (October 2, 2008) is when the loss became appreciable.  See id.

The Court cannot say for certain at what point Plaintiffs' loss became appreciable.  Generally, determining when a loss becomes appreciable is a question of fact for a jury.  However, the dates urged by the parties are unreasonable and contrary to law.  The evidence shows that Plaintiffs' losses became appreciable in September or October 2008.  Taking the evidence in the light most favorable to Plaintiffs, the Court assumes that the damage became appreciable on the day Plaintiffs contacted Nationwide and informed Nationwide of their suspicion of tainted feed – October 2, 2008.  See PUMF's 41, 42.  Using October 2, 2008, as the date that the one year limitation period began, see JUMF 11, absent tolling, Plaintiffs had until October 2, 2009, in which to bring suit on their first party claim.

Plaintiffs argument that the October 3, 2008, letter from Nationwide is equivocal is not persuasive.  Plaintiffs are correct that the limitations period was tolled from the date Nationwide received notice of Plaintiffs' claim (October 2, 2008) until the date Nationwide unequivocally denied the claim in writing.  See Prudential, 51 Cal.3d at 687; Ashou, 138 Cal.App.4th at 757; Doheny Park, 132 Cal.App.4th at 1088.  However, Nationwide's October 3, 2008, letter, which was sent to Plaintiffs' legal counsel, is an unequivocal denial of the first party property claim.  The October 3, 2008, letter states in pertinent parts:  (1) "Upon careful review of the facts of loss

and policy provisions, we regret we must inform you there is no first party coverage for this loss." (2) "Unfortunately, the policy does not cover heads of cattle unless they are specifically scheduled in the declarations page.  Therefore, we are unable to cover the loss." (3) "We regret we will be unable to provide coverage for the first party property loss." (4) "As this concludes the handling of the first party property claim, we would also like to take this opportunity to advise you of the suit provision of this policy."  Davis Dec. Ex. C.  This language is clear and definite.  The October 3, 2008, letter unequivocally states several times that there is no first party coverage and the handling of the first party property claim, i.e. the loss of Plaintiffs' own cattle, has concluded.  See id.  Moreover, the October 3, 2008, letter expressly quotes the limitations period provision of the Policy.  See id.  If the handling of the first party claim had not ended, then there was no need to inform Plaintiffs of the one year limitations period.

Plaintiffs contend that the letter is equivocal or ambiguous based on the sentence that appears immediately following the quotation of the one year limitation provision.  That sentence reads:  "Based upon this Condition [i.e. the one year limitation], and the time allowed to investigate your claim, you would have until May 21, 2009, to bring action *or submit new information to be reviewed.*  Any claims made or paperwork received after this date may be denied."  See id. (emphasis added).  Plaintiffs contend that the use of the May 21, 2009, date corresponds to nothing and creates an ambiguity, and the sentence creates an option of either bringing suit or submitting new information.  Because new information was submitted on April 13, 2009, Plaintiffs argue that they chose an option which continued the review process.

The Court agrees that use of the May 21, 2009, date appears arbitrary, or at least based on an incomplete investigation.  However, identifying the wrong deadline does not make the October 3 letter equivocal.  The deadline upon which to bring suit has nothing to do with whether the claim has been denied, and the letter states several times that the claim is denied and handling of the claim has concluded.

With respect to the "option" that the October 3 letter allegedly created, the Court cannot agree.  The sentence indicates a willingness to review additional information if submitted by May 21, 2009.  The sentence does not indicate that the investigation remains on-going or that the

submission of additional information will cause a re-opening of the case.  The October 3 letter

expressly stated that coverage was denied and that the letter "concludes the handling of the first

party property claim."  See id.  At best, "the evidence suggests that [Nationwide] was willing to

reconsider its denial upon receipt of further pertinent information.  A statement of willingness to

reconsider does not render a denial equivocal."  Migliore, 97 Cal.App.4th at 605; see Tig Ins. Co.

v. Ace Am. Ins. Co., 236 Fed. Appx. 336, 337 (9th Cir. 2007); Heighley, 257 F.Supp.2d at 1257;

Singh, 63 Cal.App.4th at 147-48.  The October 3, 2008, letter is an unequivocal denial of first

party liability, despite expressing a willingness to consider additional information.[7]  See id.

Finally, Plaintiffs rely on the April 29, 2009, denial letter.  Citing PUMF 58, Plaintiffs

contend that they believed that the first party property claim investigation was still on-going

because both the first party and third party claims arose from the same course of events.

However, PUMF 58 only states that between October 2, 2008, and April 13, 2009, Plaintiffs

were compiling information in preparation for their state court lawsuit against the feed suppliers.

See PUMF 58.  There is nothing in PUMF 58 that discusses either a belief that Defendants were

still investigating the first party claim or the basis for such a belief.  See id.  Further, the joint

undisputed facts acknowledge that, "[d]espite denying of the first party claims, Nationwide

continued to investigate the third party liability claim . . . ."  JUMF 30.[8]  In other words, Plaintiffs

acknowledge that it was the third party claim that continued to be investigated, not the first party

claim.  See id.

Additionally, Nationwide sent a correspondence to Plaintiffs' counsel dated October 30,

2008.  See Davis Dec. Ex. D.  The letter identifies the insureds as the Gaylords and the claimant

as Kamangar.  See id.  The letter requests information, including copies of any contracts between

the insured and the claimant, so that the claim can be evaluated.  See id.  The letter clearly is in

---

[7]The information provided by Ted Gaylord in the April 13, 2009, interview dealt largely with Gaylord's investigation into the tainted feed.  See Davis Dec. Ex. G.  There was no information regarding the cattle being listed on the declaration sheets of the Farm Policy.  The absence of the cattle on the declaration sheets was the basis for the October 3 denial.  It is not clear why the additional information provided by Gaylord on April 13, 2009, would have any bearing on the denial, or why Plaintiffs would think that the additional information would affect the October 3 denial.  The additional information simply does not address the actual basis of the denial.

[8]The JUMF's were filed pursuant to the Scheduling Order.  See Court's Docket Doc. No. 10 at 4:2-16.

relation to the claims of Kamangar.  There is nothing in the October 30, 2008, letter that indicates that the first party claims were still under consideration.  See id.

Further, the text of the April 29, 2009, letter makes clear that it relates to the third party claims of Kamangar.  See Davis Dec. Ex. H.  The April 29 letter identifies the insureds as the Gaylords, identifies the claimant as Kamangar, and states investigation and analysis have been completed concerning "coverage for claims of loss by Par Kamangar . . . due to poisoning of cattle that were being raised at our insured's feed lot."  Id.  No first party provisions of the Farm Policy appear to be referenced in the April 29 letter, rather, the referenced terms appear to relate to Coverage H for third party claims.  See id.  The Court sees nothing about the April 29 letter that would indicate that the first party property claims had been investigated up until April 29, 2009.[9]  No evidence has been submitted that shows Defendants were considering or investigating Plaintiffs' first party property claims after October 3, 2008.[10]

In light of above, the Court cannot agree with Plaintiffs' tolling arguments.  Viewed in the light most favorable to Plaintiffs, the limitations period began to run on October 2, 2008, was tolled for one day, and then continued to run following the unequivocal denial letter on October 3, 2008.  No evidence has been presented that indicates Defendants investigated or considered or kept open the first party property claim after October 3, 2008.[11]  As such, Plaintiffs had until roughly October 3, 2009, in which to file suit on their first party property claim.  This lawsuit

---

[9]Plaintiffs also point to references in the April 29 letter regarding Plaintiffs 50% equity share in Kamangar's cattle and to Defendants' willingness to reconsider coverage if suit is filed based on the allegations in the suit or additional information.  Plaintiffs do not explain the significance of these aspects of the April 29 letter.  A reference to Plaintiffs' 50% ownership interest in the cattle could mean that, whatever the monetary value of the cows, that value would be evenly split between Kamangar and Plaintiffs.  That is, the figure would seem to be a key factor in evaluating the amount of Kamangar's damages.  As for Defendants' offer to reconsider if suit was filed, the paragraph that Plaintiffs rely on deals with reconsideration if Kamangar files suit against Plaintiffs.  See Davis Dec. Ex. H.  Thus, the pertinent paragraph and sentence expressly deal with third party claims only.

[10]The Court notes that the January 12, 2010, denial letter (which was in response to Kamangar's post-April 29, 2009, lawsuit) is very similar to the April 29, 2009, denial letter.  The January 12 letter deals entirely with Kamangar's suit, and it provides no analysis concerning Plaintiffs' first party claims.  See Davis Dec. Ex. J.

[11]Even if the Court concluded that Ted Gaylord's April 13, 2009, recorded statement constituted new information as envisioned by the October 3 letter, Nationwide issued a denial sixteen days later on April 29, 2009.  Plaintiffs agree that the limitations period would have run from April 29, 2009, to October 29, 2009.  See Court's Docket Doc. No. 26 at 14:16-17.  From October 3, 2008, to April 13, 2009, is 6 months and 10 days.  From April 29, 2009, to October 29, 2009, is 6 months.  By the time Kamangar's lawsuit was tendered to Defendants on October 29, 2009, the one year limitations period on Plaintiffs' first party property claim had already expired.

was filed well beyond this deadline on March 4, 2010.  Because Plaintiffs did not file suit within the Farm Policy's one year limitations provision, summary judgment in favor of Defendants on Plaintiffs' first party property claims under Coverage E is appropriate.

    b.    Third Party Liability Coverage

Defendants rely on two exclusions to argue that there is no coverage:  the contractual damages exclusion and the custom feeding exclusion.  Kamangar's complaint includes a claim for negligence and a claim for breach of oral agreement, and both claims are based on Plaintiffs' failure to properly care for and feed Kamangar's cattle.  See Court's Docket Doc. No. 23 at Ex. A at ¶¶ 7-12, 16-19.  The custom feeding exclusion excludes damages arising out of the feeding, or the failure to feed, the livestock of others.  See JUMF's 13, 15, 19.  This is precisely what Kamangar alleges, and is also part of Plaintiffs' normal business operations.  See JUMF 21; PUMF 1.  As for the contractual liability exclusion, Plaintiffs do not contest Defendants' contention that Kamangar's claim represents damages that Plaintiffs are obligated to pay by reason of assumption of liability in a contract or agreement.  See JUMF's 13, 19.  In the absence of an argument to the contrary by Plaintiffs regarding the contractual liability exclusion, for purposes of this motion, the Court will view both the custom feeding and contractual liability exclusions as encompassing the causes of action in Kamangar's complaint.  Cf. Court's Docket Doc. No. 23 at Ex. A at ¶¶ 7-12, 16-19 with JUMF's 13, 15, 19.

However, that the exclusions appear to apply to Kamangar's complaint does not end the inquiry.  Plaintiffs have pointed to the Livestock Operations Endorsement ("LOE") to support their claim of coverage.  Due to the operation of the LOE, there is an ambiguity in Coverage H.

As noted above, the LOE in bold letters states that it "changes the policy" and instructs the insured to "please read it carefully."  Davis Dec. Ex. A-1 at 94.  The LOE then states that it "modifies insurance provided" under Coverage H.  Id.  Next the LOE states, "In consideration of the premium charged for this endorsement, the liability coverage of this policy applies to *your* livestock operations."  Id. (emphasis added).  The LOE concludes by stating that "all terms and conditions of this policy apply unless modified by this endorsement."  Id.

The parties ascribe different interpretations of the LOE's affect on the Farm Policy.

23

1   Defendants contend that the LOE does not override the custom feeding exclusion because the

2   custom feeding exclusion itself states that there is no coverage for this activity "unless

3   specifically endorsed," see JUMF 13, but the LOE does not specifically mention custom

4   feeding.[12]  Further, Defendants have included as part of their reply a copy of a "Custom Feeding

5   of Livestock Coverage Endorsement," and this document is indeed different from the LEO.  The

6   submitted Custom Feeding of Livestock Coverage Endorsement specifically references and

7   deletes "exclusion q," the custom feeding exclusion.  See Passalacqua Dec. Ex. A.  On the other

8   hand, Plaintiffs contend that special endorsements override general exclusions.  Because their

9   specific operation entails feeding other persons' cattle, and the LOE applies to "your [i.e. their]

10  livestock operation," the LOE has the effect of including coverage for their feeding of, and caring

11  for, the cattle of others.   The Court finds that both interpretations of the LOE's effect on

12  Coverage H to be reasonable.  Because there are two reasonable interpretations of the LOE's

13  effect on Coverage H, there is an ambiguity in Coverage H.  See Powerine, 37 Cal.4th at 390.

14      Applying the rules for interpreting ambiguous policies/contracts to Coverage H and the

15  LOE would normally lead to the conclusion that the Farm Policy covers both claims in

16  Kamangar's complaint through operation of the LOE.  Although the LOE states that it modifies

17  and changes the policy, it does not explain how it changes the policy.  The words of the

18  endorsement state that "your livestock operation" is covered.  See Davis Dec. Ex. A-1 at 94.  The

19  "your" in the LOE obviously refers to Plaintiffs, and thus has the effect of providing coverage

20  under Coverage H to Plaintiffs' specific livestock operation.  It is undisputed that Plaintiffs'

21  particular livestock operations entails the caring for, and feeding of, the cattle of others as per

22  contracts.  See JUMF 21; PUMF 1.  Given the nature of Plaintiffs' particular livestock operation,

23  as well as the rule that coverage provisions are interpreted broadly, the plain meaning that a

24  layperson would give the LOE is that it overrides both the contractual liability and custom

25  feeding operations exclusions as applied to Plaintiffs' particular operation.  Moreover, it is

26  undisputed that Plaintiffs believed that they were obtaining comprehensive coverage for both

27

28      [12]Defendants do not mention the "contractual liability" exclusion as part of their reply, but instead focus on
    the custom livestock exclusion.  See Court's Docket Doc. No. 31 at pp.4-6.

their personal and business interests.  Plaintiffs are correct that it would be counterintuitive for them to purchase insurance that would not cover such a significant portion of their livestock operation.  In other words, the reasonable expectations of Plaintiffs would support their interpretation that the LOE overrides the exclusions at issue.  Finally, even if the expectations of Plaintiffs did not resolve the ambiguity, Nationwide created the ambiguity.  It inserted an endorsement that expanded coverage, yet failed to define the endorsement's parameters or explain the endorsement's effect.[13]  That there may be another endorsement that more specifically overrides the custom feeding exclusion, i.e. the Custom Feeding of Livestock Endorsement, is of no import.  The issue is the effect of the LOE on Coverage H.  The LOE is an expansive endorsement that enlarges the scope of coverage.  The LOE's broad language is no less effective because it does not specifically identify exclusions that it overrides or specifically explain how it modifies Coverage H, especially when read by a lay person or someone whose livestock operation includes the contractual obligation to raise and feed the cattle of others.  Since Nationwide created the ambiguity, the LOE would be interpreted against them.[14]

However, the third party liability claim cannot be resolved on the above analysis.  There is a genuine disputed material fact created by extrinsic evidence.  In opposition to this motion, Ted Gaylord declared that, based on an incident involving a local dairy, he told Stewart in March 2007 that he wanted an insurance policy that would cover the death of cattle due to contaminated feed.  See Ted Gaylord Dec. ¶ 8.[15]  Gaylord declared that Stewart told him that the Farm Policy would provide coverage for cattle losses due to "consumption of poisonous/contaminated feed."  Id. at ¶ 9.  Gaylord declared that Stewart did not explain to Gaylord either the meaning or the existence of the custom care and feeding exclusion or the business pursuits and contractual liability exclusions.  Id. at ¶ 10.  Gaylord declared that the only additional coverage Stewart mentioned was an expensive "catch all" that was used in the Midwest and that was not necessary

[13] In fact, Defendants have not explained what the LOE does or what effect it has on the Farm Policy.

[14] Further, as a special endorsement, the LOE would override contrary terms that are part of the general endorsement.  See Venoco, 175 Cal.App.4th at 766; Frontier Oil, 153 Cal.App.4th at 1463.

[15] Sheri Gaylord's declaration is essentially identical to Ted Gaylord's declaration with respect to obtaining the Farm Policy from Stewart.  See Sheri Gaylord Dec. ¶¶ 8-10.

for Gaylord.  Id.  On the other hand, Stewart declared that, in March 2007, he informed Gaylord that, "for an additional premium, he could obtain coverage for the custom care and feeding of cattle."  Stewart Dec. ¶ 3.  Stewart declared that his recommendation was prompted by Gaylord's loss of cattle owned by others from heat and dehydration.  Id. at ¶ 4.  Stewart declared that Gaylord declined coverage and indicated that "if a problem should arise with the cattle due to bad feed, [Gaylord] would seek redress against the feed suppliers and did not want additional insurance coverage for such a loss."  Id.

Gaylord's declaration and Stewart's declaration are wholly incompatible.  If Stewart's declaration is believed, then Gaylord knew well that the death of other's cattle from contaminated feed would not be covered.  For there to be such coverage, Gaylord would have known from his conversation with Stewart that a special custom feeding endorsement was required, and Gaylord expressly declined that endorsement.  See Stewart Dec. ¶¶ 3-4.  With the knowledge that the Farm Policy did not cover death due to contaminated feeding and that Gaylord actually declined coverage, then Gaylord never intended to obtain coverage and he could not have reasonably expected to have such coverage under the Farm Policy.  In other words, under Stewart's version of events, there would be no coverage for Kamangar's claims.  On the other hand, Gaylord's declaration indicates that he expressly told Stewart that he wanted coverage for cattle death related to contaminated feed, Stewart recommended changing to the Farm Policy, and Stewart expressly said that the Farm Policy actually covered cattle death due to contaminated feed.  See Ted Gaylord Dec. ¶¶ 8-9; Sheri Gaylord Dec. ¶¶ 8-9.  Under Gaylord's version, he would not necessarily be on notice that cattle death due to contaminated feed was not covered.  The ambiguity of the LOE, combined with Gaylord's version of what Stewart said and Gaylord's instructions to Stewart, would support the intent to obtain coverage and a reasonable expectation of coverage by Gaylord.  In other words, under Gaylord's version of events, there would be coverage for Kamangar's claims.

The Court cannot resolve the conflict between Stewart's and the Gaylords' respective declarations.  Under California law, it is for the trier of fact to resolve both the conflicting extrinsic evidence and to interpret the ambiguous policy.  See City of Hope, 43 Cal.4th at 395;

Garcia, 36 Cal.3d at 439.  Summary judgment on the third party coverage claim will be denied.

2.      Breach of the Covenant of Good Faith and Fair Dealing/"Bad Faith"

        *Defendants' Arguments*

        Defendants argue that there is insufficient evidence of bad faith.  First, the one year limitations period applies to any bad faith connected to the denial under Coverage E.  Second, there is no indication that benefits were withheld unreasonably and without proper cause. Defendants argue that they promptly investigated and repeatedly tried to gather information from Plaintiffs' attorney.  The reasons for denial were reasonably based on the Farm Policy's coverages and exclusions.  Once Kamangar's third party claim was submitted, Defendants hired an attorney to analyze whether coverage existed.  Mere disagreement with a coverage decision, or a mere erroneous decision, are insufficient to support a bad faith claim.  Third, there was a "genuine dispute" whether coverage existed.  The existence of a genuine dispute precludes a bad faith claim.  Here, a genuine dispute existed because Plaintiffs' own cattle were not included in the declarations of Coverage E and the cause of loss was not included under Coverage E.  For the third party claim, a genuine dispute exists regarding the application of Coverage H's exclusions for custom feeding and contractual liability.  Defendants attempted to investigate, sought to communicate with Plaintiffs' counsel, hired an attorney to research and provide an opinion, and Stewart told Nationwide that he had offered custom feeding coverage to Gaylord, but Gaylord declined.

        *Plaintiffs' Opposition*

        Plaintiffs argue that there are triable issues of fact whether the cattle were covered under the Policies.  Further, the October 3, 2008, denial letter was issued just 24 hours after receiving notice of Plaintiffs' claim, despite knowing that Plaintiffs were still trying to find the cause of death and attempting cure the problem.  The 24 hour investigation was inadequate.  Further, the letter included an arbitrary date of loss (May 21, 2008) which was intended to trigger the running of the limitations period prematurely.  Where such facts exists, summary judgment on bad faith claims is improper.  Also, the "genuine dispute doctrine" is only proper when it is indisputable

that the basis for the insurer's denial was reasonable.  When the duty to defend is at issue, the genuine dispute doctrine does not apply.

*Legal Standard*

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing," which "requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits."  Wilson v. 21s t Century Ins. Co., 42 Cal.4th 713, 720 (2007); Egan v. Mutual of Omaha Ins. Co., 24 Cal.3d 809, 818 (1979).  "When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort."  Wilson, 42 Cal.4th at 720; Egan, 24 Cal.3d at 818.  However, "bad faith" implies the notion of conscious unfair dealings, and mere negligence or mistaken judgment is insufficient.  Nieto v. Blue Shield of Cal. Life & Health Ins. Co., 181 Cal.App.4th 60, 86 (2010); Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., 90 Cal.App.4th 335, 345 (2001).  An insurer "must give at least as much attention to the [insured's] interests as it does its own," and "cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."  Egan, 24 Cal.3d at 819; see Wilson, 42 Cal.4th at 720.  "There are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause."  Progressive West Ins. Co. v. Superior Court, 135 Cal.App.4th 263, 278 (2005); Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1151 (1990).  If a loss is not covered and no benefits are due, there can be no tort liability for breach of the implied covenant, even if the investigation was negligent.  Benavides v. State Farm General Ins. Co., 136 Cal.App.4th 1241, 1250-51 (2006).  The "ultimate test" in bad faith liability claims is whether the insurer's denial/conduct was unreasonable.  See Nieto, 181 Cal.App.4th at 86.  Where there is a "genuine issue" or "genuine dispute" as to the "insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute."  McCoy v. Progressive W. Ins. Co., 171 Cal.App.4th 785, 793 (2009).  "The reasonableness of the insurer's decisions and actions must be evaluated as of the time that the decisions were made," and not in the light of

1    subsequent events. <u>Jordan v. Allstate Ins. Co.</u>, 148 Cal.App.4th 1062, 1073 (2009); <u>Chateau</u>

2    <u>Chamberay</u>, 90 Cal.App.4th at 347.  "A genuine dispute exists only where the insurer's position

3    is maintained in good faith and on reasonable grounds." <u>Wilson</u>, 42 Cal.4th at 723.  Summary

4    judgment may be granted "when it is undisputed or indisputable that the basis for the insurer's

5    denial of benefits was reasonable . . . ." <u>Amadeo v. Principle Mut. Life Ins. Co.</u>, 290 F.3d 1152,

6    1161-62 (9th Cir. 2002); <u>Wilson</u>, 42 Cal.4th at 724.

7         *Discussion*

8         Plaintiffs' complaint for bad faith is based on Defendants' denial of all liability "under

9    the Policies," including the refusal to undertake the defense of Kamangar's lawsuit.  Complaint

10   at ¶¶ 30, 33.  The bases of the bad faith cause of action includes Defendants' resolution of

11   Plaintiffs' first and third party coverage claim.

12        Plaintiffs' bad faith claim with respect to denial of coverage under Coverage E (the first

13   party property claim) is time barred.  A contractual limitations period will act to bar both breach

14   of contract and tort claims when the claims are "on the insurance policy," meaning that the suit

15   seeks to recover policy benefits or is grounded upon a failure to pay policy benefits. <u>Campanelli</u>

16   <u>v. Allstate Life Ins. Co.</u>, 322 F.3d 1086, 1096-97 (9th Cir. 2003); <u>Shugerman v. Allstate Ins. Co.</u>,

17   594 F.Supp.2d 1131 (C.D. Cal. 2009); <u>Jang v. State Farm Fire & Cas. Co.</u>, 80 Cal.App.4th 1291,

18   1300-01 (2000); <u>CBS Broadcasting, Inc. v. Fireman's Fund, Ins. Co.</u>, 70 Cal.App.4th 1075, 1086

19   (1999); <u>Velasquez v. Truck Ins. Exch.</u>, 1 Cal. App. 4th 712, 721 (1991).  As noted above, the one

20   year limitations period expired before March 2010, and Plaintiffs' bad faith claim is based on the

21   failure to pay benefits.  As such, this bad faith claim is barred and Plaintiffs cannot recover.  <u>See</u>

22   <u>Campanelli</u>, 322 F.3d at 1096-97; <u>CBS</u>, 70 Cal.App.4th at 1086; Complaint at ¶¶ 30, 33.

23        With respect to Plaintiffs' bad faith claim based on denial of coverage and defense under

24   Coverage H (the third party liability claim ), the Court must first address the *Harbison* case.

25   Plaintiffs are correct that a case from the Eastern District of California has questioned whether

26   the "genuine dispute" doctrine can ever apply when the duty to defend is at issue.  <u>See</u> <u>Harbison</u>

27   <u>v. American Motorists Ins. Co.</u>, 636 F.Supp.2d 1030, 1040 (E.D. Cal. 2009).  However, at this

28   point, the Court cannot follow *Harbison*.  First, the Ninth Circuit has applied the "genuine

1    dispute doctrine" when the duty to defend was at issue.  See Lunsford v. American Guar. & Liab.

2    Ins. Co., 18 F.3d 653, 654, 656 (9th Cir. 1994).  In Lunsford, the insurer refused to defend a

3    counterclaim against the insured for abuse of process.  See id. at 654.  The Ninth Circuit found

4    the insurance policy ambiguous and resolved the ambiguity in favor of the insureds, thus

5    mandating that the insurer cover the defense costs.  See id. at 654-56.  Despite finding a breach

6    of the duty to defend, the Ninth Circuit held, "Because [the insurer] investigated the insureds'

7    claim and based its refusal to defend on that information and a reasonable construction of the

8    policy, [the insurer] did not act in bad faith, and we conclude that [the insurer] was entitled to

9    summary judgment on the implied covenant of good faith and fair dealing claim."  Id. at 656.

10   Second, several district courts have acknowledged and/or have applied the genuine dispute rule

11   in cases involving the duty to defend.  See Sell v. Nationwide Mut. Ins. Co., 2010 U.S. Dist.

12   LEXIS 121513, *9-*11 (E.D. Cal. Nov. 17, 2010) (recognizing that the insurer did not act

13   unreasonably in its interpretation of an ambiguous provision); Vaid-Raizada v. Lexington Nat'l

14   Ins. Co., 2009 U.S. Dist. LEXIS 76314, *4-*5 (C.D. Cal. Aug. 12, 2009) ("Courts have

15   consistently applied the 'genuine dispute' rule in assessing bad faith tort claims on the duty to

16   defend . . . ."); Larkin v. ITT Hartford, 1999 U.S. Dist. LEXIS 9960, *28 (N.D. Cal. June 29,

17   1999) ("Second, an insurer generally does not act in bad faith if there exists a genuine dispute as

18   to the insurer's duty to defend.").  Third, a prominent California Insurance treatise has taken the

19   position that, while factual disputes preclude application of the "genuine dispute doctrine" in

20   duty to defend cases, legal disputes do not preclude application of the "genuine dispute

21   doctrine."  H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter

22   Group 2010) §§ 12:618.5, 12:618.6, 12:618.10 (hereinafter "Croskey").  "[W]here the insurer

23   refuses to defend a claim against its insured based on a legal dispute over coverage . . . a

24   'genuine dispute' may preclude bad faith liability."  Id. at § 12.618.10 (emphasis in original).  In

25   duty to defend cases, a "potential coverage cannot be based on an unresolved dispute concerning

26   policy interpretation or other purely legal questions that are ultimately resolved in favor of the

27   insurer."  Id. at § 7:529; see also Griffin Dewartering Corp. v. Northern Ins Co. of N.Y., 176

28   Cal.App.4th 172, 209 (2009).  In light of these of authorities, the Court must respectfully

disagree with *Harbison*'s conclusion that the "genuine dispute doctrine" cannot apply in all bad faith duty to defend cases.

As for the substance of Plaintiffs' bad faith claim based on Coverage H, there is insufficient evidence that Defendants have denied coverage unreasonably.  There is no dispute that Defendants made multiple attempts to contact Plaintiffs' counsel in order to investigate the claim.  The evidence presented shows that multiple letters were sent and multiple telephone calls were made between October 2008 and April 2009.  See JUMF's 30-34; DUMF's 9-21.  Correspondences were also sent to Stewart, at Stewart's request, in an attempt to gather information.  See DUMF's 18-19.  There is no record of any material responses from Plaintiffs until April 9, 2009, when Plaintiffs' counsel advised Defendants of Plaintiffs' lawsuit against the feed supplier, and April 13, 2009, when Ted Gaylord gave a recorded statement that discussed *inter alia* his relationship with Kamangar and his investigation into the contaminated feed.  See JUMF's 33-34; Davis Dec. Ex. G.  Once Gaylord provided the recorded statement, Defendants denied the third party coverage claim on April 29, 2009, based on several exclusions including the custom feeding of livestock exclusion.[16]  See Davis Dec. Ex. H.  There is no dispute that the death of Kamangar's cattle fit within the plain language of the custom feeding exclusion.  Despite the denial, Defendants remained willing to reassess their decision if Kamangar filed suit.  See id.  Once Kamangar filed suit, Defendants sent the case to an outside attorney for evaluation.  See DUMF 24.  The attorney reviewed the case and concluded that there was no coverage based on several exclusions, including the custom feeding exclusion.  See JUMF 37; Dave Dec. Ex. J.  Again, the basis of Kamangar's claims fit within the express language of the custom feeding exclusion.  Sending the claim to outside counsel would seem to indicate an additional precaution to ensure that the Policy is properly interpreted and the rights of the insured and insurer are respected.  Further, although there is no indication that the outside counsel is an insurance

---

[16]Other exclusions were identified in the April 29, 2009, letter (the "damage to property" and "damage to product" exclusions).  However, Defendants cite to only the custom feeding exclusion in this motion.  See Court's Docket Doc. No. 20 at 17:26-19:3; JUMF 13; Davis Dec. Ex. H.

1  "expert," reliance on an expert opinion to deny a claim is an indication of reasonable behavior.[17]

2  See Guebara v. Allstate Ins. Co., 237 F.3d 987, 993 (9th Cir. 2001); McCoy, 171 Cal.App.4th at

3  793; Fraley v. Allstate Ins. Co., 81 Cal.App.4th 1282, 1292 (2000).

4  It is true that in May 2009 Kamangar's attorney wrote a letter to Defendants, and the

5  letter indicated that Plaintiffs had a reasonable expectation of coverage through operation of the

6  LOE.  See Davis Dec. Ex. I.  The Court has found potential merit to this very position.  However,

7  the interpretation of a policy, and whether an ambiguity exists, are legal disputes that can support

8  application of the "genuine dispute doctrine."  See Guebara, 237 F.3d at 993; American Cas. Co.

9  v. Krieger, 181 F.3d 1113, 1123 (1999); Wilson, 42 Cal.4th at 723; Griffin Dewartering, 176

10  Cal.App.4th at 208-09; Croskey at §§ 7:529, 12:618.10.  Plaintiffs have not shown that

11  Defendants' interpretation of the Farm Policy, that is that no coverage was available, was

12  unreasonable especially given the nature of Kamangar's claims and the existence of a specific

13  custom feeding and livestock endorsement that was not included in the Farm Policy.  "Because

14  [Defendants] investigated [Plaintiffs'] claim and based its refusal to defend on that information

15  and a reasonable construction of the policy, [Defendants] did not act in bad faith . . . ."  Lunsford,

16  18 F.3d at 656; see also Griffin Dewartering, 176 Cal.App.4th at 208-09; Croskey at §§ 7:529,

17  12:618.10.

18  Summary judgment in favor of Defendants on Plaintiffs' bad faith claims is appropriate.

19

20  3.    Punitive Damages

21       *Defendants' Argument*

22  Defendants argue that there is not clear and convincing evidence of fraud, malice, or

23  oppression.  Nationwide argues that it investigated the claim, made a reasonable determination

24  based on the information possessed, and later gave the claim to an outside counsel to review.

25  The claims handling was reasonable and not worthy of punitive damages.

26  _____

27  [17]Reliance on an expert opinion will not defeat a bad faith claim where the insurer dishonestly selected the
expert, the expert was unreasonable, or where the insurer does not conduct a thorough investigation.  McCoy, 171

28  Cal.App.4th at 793.  However, there is no evidence that Defendants dishonestly selected the attorney, Plaintiffs have
not argued that the attorney's opinion is "unreasonable," and Plaintiffs have presented no evidence that the
investigation of the third party liability claim was inadequate.

*Plaintiffs' Opposition*

Plaintiffs' argument is essentially identical to their arguments with respect to their bad faith claims. Where triable issues of fact exist as to whether coverage exists, and thus whether the insurer acted in bad faith, there are also triable facts as to whether the insurer acted with malice, oppression, or fraud. The same facts that preclude summary judgment on the bad faith claim preclude summary judgment on the punitive damages claim.

*Legal Standard*

Under California law, punitive damages "may be available in actions not arising from contract, where fraud, oppression, or malice is proved." Moradi-Shalal v. Fireman's Fund Ins. Cos., 46 Cal.3d 287, 305 (1988); Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1080 (2007). "Malice" is defined as intentional injury or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1); Roby v. McKesson Corp., 47 Cal.4th 686, 712 (2009). "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2); Roby, 47 Cal.4th at 712. The plaintiff must prove fraud, oppression, or malice by "clear and convincing evidence." Cal. Civ. Code § 3294(a); Roby, 47 Cal.4th at 712; Jordan, 148 Cal.App.4th at 1080. The "clear and convincing evidence" standard applies at trial and at summary judgment. Gathenji v. Autozoners, LLC, 703 F.Supp.2d 1017, 1036 (E.D. Cal. 2010); Spinks v. Equity Residential Briarwood Apts., 171 Cal.App.4th 1004, 1053 (2009). A mere violation of the duty of good faith and fair dealing is by itself insufficient to support punitive damages. Silberg v. California Life Ins. Co., 11 Cal.3d 452, 462-63 (1974); Jordan, 148 Cal.App.4th at 1080; see PPG Industries, Inc. v. Transamerica Ins. Co., 20 Cal.4th 310, 319 (1999). Rather, an insurance company's breach of the duty of good faith and fair dealing must be coupled with clear and convincing evidence of malice, fraud, or oppression in order to justify punitive damages. PPG Industries, 20 Cal.4th at 319; Jordan, 148 Cal.App.4th at 1080.

*Discussion*

Initially, the Court has determined that summary judgment is appropriate as to Plaintiffs'

1  bad faith claims.  "If the insurer did not act in bad faith, punitive damages are unavailable . . . ."

2  American Cas. Co. v. Krieger, 181 F.3d 1113, 1123 (9th Cir. 1999); Lunsford, 18 F.3d at 656.

3       Similarly, with respect to punitive damages based on conduct involving the first party

4  property claim, the one year limitations period bars both Plaintiffs' breach of contract and

5  tortious bad faith claims based on this conduct.  "There is no separate cause of action for punitive

6  damages – they are only ancillary to a valid cause of action."  Caira v. Offner, 126 Cal.App.4th

7  12, 39 n.20 (2005).  As such, Defendants' conduct with respect to the first party property claim

8  cannot support punitive damages.

9       Alternatively, with respect to the third party claim, for similar reasons that summary

10  judgment on Plaintiffs' bad faith claim was appropriate, summary judgment on the punitive

11  damages request is appropriate.  Again, Defendants made multiple attempts to contact Plaintiffs

12  (through their counsel) in order to investigate the claim, Defendants identified an express

13  exclusion, the plain language of which encompasses Kamangar's claims, Defendants were

14  willing to reconsider or re-review the claim once Kamangar filed suit, and Defendants sent the

15  case for independent evaluation by an attorney.  Plaintiffs have not shown that the investigation

16  for Coverage H purposes was inadequate or that reliance on the reviewing attorney's opinion was

17  unreasonable.  Sending the case for review by the attorney indicates an awareness of rights, it

18  does not indicate oppression or a disregard of rights.  That Defendants found exclusions

19  applicable, especially the custom feeding exclusion, does not in and of itself show fraud, malice,

20  or oppression.  In short, Plaintiffs have presented no evidence that would support punitive

21  damages by clear and convincing evidence.  See PPG Industries, 20 Cal.4th at 319; Jordan, 148

22  Cal.App.4th at 1080.

23       Summary judgment on Plaintiffs' punitive damages request is appropriate.

24

25                      **CONCLUSION**

26       Defendants move for summary judgment on Plaintiffs' breach of contract, bad faith, and

27  punitive damages claims.

28       As to Plaintiffs breach of contract claims regarding first party property coverage under

Coverage E, summary judgment in favor of Defendants is appropriate because Plaintiffs did not file suit within the Farm Policy's one year limitations period.  The evidence establishes that, at the latest, Plaintiffs became aware of "appreciable" damage to the cattle on October 2, 2008 (when Plaintiffs first submitted their claims).  However, this suit was not filed until March 4, 2010.  Even considering tolling, this lawsuit was filed after the one year limitations period expired.

As to Plaintiffs' breach of contract claims regarding third party liability coverage, summary judgment is not appropriate.  There is an ambiguity in Coverage H due to the LOE.  Normally, this ambiguity would have been interpreted to provide coverage for Plaintiffs.  However, the respective declarations of the Gaylords and Stewart are conflicting and irreconcilable.  The Gaylords' declarations show that they requested coverage for cattle death due to tainted feed and that Stewart told them that the Farm Policy provided that coverage.  Stewart's declaration shows that he told Ted Gaylord that coverage for custom feeding of livestock was available for an additional premium, but that Gaylord expressly refused and said that he would seek redress from the feed supplier if a problem arose.  The Court cannot resolve this material dispute in this motion.  The trier of fact will resolve both the conflicting testimony and the ambiguity in the Farm Policy created by Coverage H and the LOE.

As to Plaintiffs' bad faith claim related to the first party property coverage decision, summary judgment is appropriate.  This claim seeks damages for the failure to pay benefits/seeks to recover policy benefits.  The claim is therefore "on the policy."  Because the claim is "on the policy," the one year limitations period bars the claim.

As to Plaintiffs' bad faith claim related to the third party liability claim, summary judgment is appropriate.  The evidence indicates that Defendants acted reasonably because they investigated the claim and embraced a reasonable interpretation of the Farm Policy.

Finally, summary judgment on Plaintiffs' request for punitive damages is appropriate because there is not clear and convincing evidence of fraud, malice or oppression, and because Plaintiffs' bad faith claims fail.

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion for summary judgment on Plaintiffs' breach of contract cause of action related to first party property coverage is GRANTED;

2.    Defendants' motion for summary judgment on Plaintiffs' breach of contract cause of action related to third party liability coverage is DENIED;

3.    Defendants' motion for summary judgment on Plaintiffs' bad faith claims is GRANTED; and

4.    Defendants motion for summary judgment on Plaintiffs' request for punitive damages is GRANTED.

IT IS SO ORDERED.

Dated:    March 4, 2011                                _____
                                                      CHIEF UNITED STATES DISTRICT JUDGE